Argued January 18; reversed March 5, 1940

## RAWLINSON v. OREGON TEXTILE MACHINES, INC., ET AL.

(99 P. (2d) 999)

Department 2.

*A. L. Veazie*, of Portland (C. D. Christensen and Veazie & Veazie, all of Portland, on the brief), for appellant.

*Eugene K. Oppenheimer*, of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for respondents.

BAILEY, J. The plaintiff, George H. Rawlinson, instituted this suit against the defendants, Oregon Textile Machines, Inc., a corporation, George F. McDougall and Charles H. Carter, to quiet his title to a patent issued to him by the United States patent office. From

a decree in favor of the defendants the plaintiff appeals.

The allegations of the complaint may be summarized as follows:

On August 9, 1938, letters patent were issued to the plaintiff on new and useful inventions in a garment pressing machine, based on his application therefor filed November 30, 1935, and ever since the date first mentioned the plaintiff has been and now is the owner and holder of such invention "and the patent rights pertaining thereto, and of said letters patent granted thereon".

In the summer of 1937 the plaintiff was negotiating with American Laundry Machinery Company for the sale to that company of the manufacturing rights and license privileges under such letters patent, and that company was ready and willing to and about to enter into a contract with plaintiff to purchase and acquire the exclusive right, license and privilege of manufacturing and selling the machine or apparatus "embodying the said improvements covered by said invention and now covered by said letters patent, and to pay or to enter into a valid and binding contract to pay the plaintiff a large sum of money". On learning of these negotiations, Oregon Textile Machines, Inc., and the individual defendants, who are the managing agents of the defendant corporation and owners of substantially all its capital stock, by letter notified American Laundry Machinery Company that the defendant corporation claimed to own certain rights and patents in the machine manufactured by the plaintiff, and the defendants Oregon Textile Machines, Inc., and Charles H. Carter "vigorously opposed the sale or lease of said machine until such time as satisfactory arrangements

should have been made between the plaintiff and said defendants to protect the alleged interest of said defendants."

Due to the assertion of the defendants in that letter and otherwise, that they claimed certain rights and patents in the plaintiff's garment pressing machine, which claim was unfounded and unjustified, American Laundry Machinery Company refused to consummate the purchase of manufacturing rights and license privileges until the plaintiff should first clear or quiet his title to such invention and letters patent as against the claim of the defendants. These acts of the defendants and their assertion of adverse claims have rendered the plaintiff's invention and patent rights unmarketable.

The relief for which the plaintiff prays is that the defendants be decreed to have no interest in the invention or the letters patent granted thereon to the plaintiff, and that the defendants be "perpetually enjoined from claiming or asserting any right, title, share or interest in or to the same."

In their answer the defendants admit the filing of the plaintiff's application for a patent and the issuance of letters patent to him as alleged in his complaint, but deny that the plaintiff is the owner and holder of such invention and the patent rights thereunto pertaining. They further admit that the defendant corporation asserts a substantial interest in the machine or device referred to in the plaintiff's complaint and that a letter was written by the defendants named to American Laundry Machinery Company opposing the sale or lease "of the said device until such time as satisfactory arrangements should have been made between the plaintiff and the defendant" corporation.

The affirmative answer of the defendants alleges that:

The defendant corporation is the owner of a safety press motor, and the corporation furnished to the plaintiff the services of the defendant McDougall as a consulting engineer to superintend the making of design drawings for, and to supervise the construction of, the plaintiff's garment pressing machine, to perfect the safety press motor owned by the defendant corporation so that it would operate such machine, and to perform other services in connection with developing and making workable the plaintiff's garment pressing machine.

Paragraphs V and VI of the defendants' affirmative answer thus read:

''That as an inducement for the performance of the services by the said George F. McDougall, on behalf of Oregon Textile Machines, Inc., referred to in this answer, and as an inducement for the use of the said safety press motor of the defendant corporation as aforesaid, and as an inducement for the redesigning and rebuilding of said safety press motor by the defendant corporation as aforesaid, the plaintiff promised and agreed with the defendants that the defendant, Oregon Textile Machines, Inc., should have a substantial equitable interest in said garment pressing machine of plaintiff.

''That in consideration of the matters and things hereinbefore alleged and the redesigning and alteration of the defendant's (Oregon Textile Machines, Inc.) safety press motor, and the inventing and securing of letters patent for the shock-absorbing latch, the plaintiff agreed with the defendant, Oregon Textile Machines, Inc., and the defendant, Oregon Textile Machines, Inc., agreed with plaintiff that the garment pressing machine and safety press motor and the shock-absorbing latch device were to be treated as component

parts of a single unit in connection with the device referred to in plaintiff's complaint and herein mentioned, and the defendant, Oregon Textile Machines, Inc., was to have an equitable interest in the aforesaid garment pressing device as herein alleged.''

It is then averred that prior to the commencement of this suit the plaintiff repudiated his agreement with the defendants and wrongfully denied that the defendant corporation had any interest in such garment pressing machine, and that the plaintiff had attempted to dispose of the patent covering the garment pressing machine, claiming that he was the sole and exclusive owner of it. The defendants further allege that by reason of plaintiff's acts the ''plaintiff has failed to do equity with the defendants and has been guilty of unfair, unjust and inequitable conduct as above set forth and he does not come into equity with clean hands and is, therefore, not entitled to any relief at the hands of a court of equity.''

The reply denies the affirmative allegations of the answer, except that ''plaintiff admits that, prior to the commencement of this suit the plaintiff denied that the defendant corporation had any interest in said garment pressing machine or any right to any interest therein, and that plaintiff has attempted to dispose of the patent covering'' the garment pressing machine, claiming that he was the sole and exclusive owner of the same.

It is affirmatively alleged in the reply that the plaintiff has paid the defendant McDougall all bills rendered by the latter for any services performed by him in connection with any of the matters referred to in the defendants' further and separate answer; that before the commencement of this suit the plaintiff requested

the defendant McDougall to render any bill he might have for services performed by him for which he had not received payment, and offered to pay McDougall for any such services; and that the defendant McDougall failed, neglected and refused to render any such bill. It is further alleged that the plaintiff has at all times been ready, willing and able to pay the defendant McDougall the reasonable value of any services performed by the latter; that plaintiff has likewise at all times been willing to pay the defendant McDougall or the defendant corporation the agreed or reasonable value of the press motor furnished and delivered by McDougall to plaintiff for the operation of his garment pressing machine, which offer of payment is renewed in the reply; and that no statement therefor has at any time been rendered.

The defendants McDougall and Carter and Judge John P. Winter owned all the stock of the defendant corporation, McDougall holding 50 per cent of it, and the others 25 per cent each. The stockholders admit that they individually have no interest in or claim to the patent here involved or the machine constructed by the plaintiff embodying the invention patented, but claim that the defendant corporation has an interest in the machine, although no interest in the patent itself is asserted.

The plaintiff has been engaged in the laundry business for approximately 30 years, 23 years of that time in Portland, where he and his son own and operate the New System laundry.

The defendant McDougall is a consulting mechanical engineer by profession and a registered professional engineer. In 1911 he was admitted to practice before the patent office, and ever since that time has been

more or less actively engaged as a patent attorney. He has been acquainted with the plaintiff since 1924.

In 1934 McDougall obtained letters patent on a safety press motor for pressing machines, which motor was "intended for equipment on the old style foot presses" used in laundries. This patent was formally assigned by McDougall to the defendant corporation March 3, 1937, although it had been understood by all the parties concerned, for some years preceding the issuance of letters patent thereon, that it was the property of the defendant corporation. A number of motors were built but did not prove successful and in 1935 the defendant corporation had on hand a stock of twenty-five such motors that it had not been able to sell.

Rawlinson, who for a number of years had been working on the invention of a garment pressing machine, employed McDougall in the fall of 1935 as a patent attorney to procure letters patent on that invention. The machine which Rawlinson developed required in its operation an air press motor, and the design of the pressing machine which McDougall prepared for filing with the application for a patent showed an air motor to be used for operating such machine. This application pointed out that the motor shown in the design or drawing was covered by a patent issued to McDougall, and stated that such motor "or any other adequate air motor may be used".

The machine invented by Rawlinson was unlike any other pressing device used in laundries and, according to the application for letters patent, was "perhaps more correctly designated as ironing machines for laundries, useful in finishing open front garments such as waiters' and surgeons' coats, shirts and the like."

The plaintiff's application for a patent was filed November 30, 1935. On December 16 following, McDougall wrote a letter to C. D. Christensen, attorney for the plaintiff, mentioning the filing of the application and referring to a conversation had between himself and the attorney during the previous week. Among other things McDougall wrote the following:

"I can be of considerable assistance in assembling and testing this machine, making such changes as may be indicated by experience and also I have a patented air motor which is peculiarly suitable for this machine and Mr. Rawlinson has expressed a desire for a license under my patent to use the motor on his machine.

"Owing to the fact that making the experimental machine will be quite expensive, I agreed to speculate with Mr. Rawlinson somewhat as follows:-

"I would contribute the services represented by the unpaid fee on the second patent case; also my time in designing the machine which is properly worth about $125.

"I would also contribute such further time as might be necessary in making changes in the experimental model, superintending its erection and testing, and would furnish an air motor ready to go on the machine without any charge therefor and for this service and equipment I suggested a small interest in the invention such as a one-sixteenth interest.

"After the experimental model is made and tested out it would of course be necessary to make finished working drawings if the machine is to go into production and in addition to the foregoing I would supervise the making of these finished drawings though the actual expense for the draftsman would be paid by the pressing machine company to be organized if the machine is successful.

"Should the above proposition or something like it appear to be advantageous to Mr. Rawlinson, I will make such a contract with him but I do not want to wait until the machine is made and tested because ob-

viously if the machine is good he would not make the deal and if it is a failure I would not want to; hence I will say that the offer is open for ten days.''

McDougall further stated in the letter the terms upon which he would permit Rawlinson to purchase his motor and the royalty to be paid in the event that the motor patented by him was manufactured by Rawlinson.

Rawlinson's attorney on December 26 answered McDougall's letter in part as follows:

''Mr. Rawlinson feels that if his machine works out as well as he anticipates it may create a market for your air motor. The present model now being built by Mr. Rawlinson is designed to use your air motor and if your motor works out satisfactorily no doubt it will be used on future machines built by Mr. Rawlinson. Taking this into consideration Mr. Rawlinson thinks that the following prices are reasonable and ought to be acceptable to you.''

After stating the prices suggested by Rawlinson for motors delivered to him or royalty to be paid for manufacturing them under McDougall's patent, the letter thus ends:

''Mr. Rawlinson does not feel that it would be advisable at this time to enter into any arrangement to sell any one an interest in his patent or machine. He would prefer to leave this matter open for future consideration, in the event the machine proves to be successful and marketable.''

On the following day McDougall replied to Christensen's letter, making this statement: ''I accept the conclusion that Mr. Rawlinson will keep the ownership of his inventions intact. That, perhaps, is as it should be.''

Rawlinson had constructed no machine embodying his inventions, prior to the filing of his application for a patent. Shortly after that application was filed he requested of McDougall a copy of his drawings that accompanied the application, stating that he wanted to use them in order to build a working model. McDougall advised him that the "pictures", as he termed the sketches, were inadequate as plans for building a machine. On his request McDougall then recommended as competent to prepare the necessary plans and specifications, one Motter, a registered engineer, who offered to do the work for $500. When Rawlinson was informed of the cost, according to McDougall, he stated that he "was sorry he had ever had anything to do with it and he would drop the whole matter."

Shortly thereafter, at the instance of Rawlinson, McDougall procured a competent draftsman who was willing to work at the price of 75 cents an hour, and this draftsman under the direction of McDougall, according to the latter's testimony, made the necessary drawings. In furthering that work McDougall advised the draftsman in regard to "the stresses and the strains and the dimensions of the materials required". The draftsman's compensation was paid by Rawlinson.

On February 18, 1936, many of the claims for the inventions incorporated in Rawlinson's application for a patent were rejected by the patent office as being unpatentable and in conflict with other patents. Upon receiving notice of the rejection, McDougall proceeded to have a check made in the patent office relative to the features asserted by the examiner to be covered by other patents, and after receiving that information prepared a brief urging Rawlinson's claim of patentability.

After he had prepared this brief McDougall, about March 12, 1936, went to see Rawlinson at his place of business and found him very much upset, due to the fact that the machine which had been constructed failed to function. Part of that failure was due to the inefficiency of the McDougall motor used to operate the pressing machine.

With reference to the rejection of Rawlinson's claims by the patent office and his discussion with Rawlinson concerning the probability of overcoming the objections specified by the examiner, McDougall testified thus:

"Q. And by that brief you expected to overcome the objections, did you not? A. Yes, I did.

"Q. Then you did not consider his patent was in any great peril, did you, at that time? A. No, I did not. I explained to Mr. Rawlinson that I thought his chances were good.

"Q. And that is not uncommon, is it, in connection with patents to get rejections of a large number or even all of the claims on the first examination? A. Yes, that is true, and in fact there are a certain class of examiners in the patent office that openly state that it is proper to reject everything once.

"Q. There wasn't any need for Mr. Rawlinson to be in any panic over those rejections? A. I didn't say he was in a panic over those rejections, and I did my best to convince him that his chances were good, without much success."

After Rawlinson had read a part of McDougall's brief he is reported by McDougall to have remarked, "I suppose you know what you are doing, but it doesn't mean anything to me. What are you going to do about the press?"

Prior to this meeting with Rawlinson, McDougall testified, he had talked the matter over with Carter

and Judge Winter, who told him that they would be willing to "pool" the patent on the motor with Rawlinson's patent. In this connection his further testimony was as follows:

"I say Mr. Carter and Mr. Winter authorized me to tell Mr. Rawlinson that if I could make the right kind of a deal, which they left to me, that we would be willing to pool our patent with Mr. Rawlinson's chances of getting one. And I explained quite at length to Mr. Rawlinson that we already had our patent, that we were willing to make such a proposition, that I would build and rebuild the proper motor as many times as necessary, and that I would guarantee a complete working machine, including the motor and the perfection of his press if it needed it. And he said he would think it over and let me know. And then to inform myself better about it I went down and measured certain presses to see the proportion of the motor to the pressing surface. * * * And a day or two later than that, it might have been three or four days later than that I went over to Mr. Rawlinson's place, and I met him down on the floor and we went up to his office to have another talk. And I had a sheet of figures and he said he didn't care anything about figures, what he wanted was a press that would press shirts. I told Mr. Rawlinson that we would pool our patent, the one we already had, with one he expected to get, which amounted to our betting our patent against his chances of getting one, and that I would guarantee this thing. And he said, 'All right, that is a deal. But if it don't work I am not bound to it.' And I said, 'All right.' I stuck out my hand and shook hands with him on it. And he said, 'When are you going to work?' I said, 'This afternoon.'

"Q. Now, did you agree to do anything further than merely work on the motor in connection with this talk that you had with Mr. Rawlinson? A. I agreed to bring the reciprocating buck press to a state of perfection with an adequate motor on it that would press

shirts as good as could be expected. I did that—that is, Mr. Rawlinson's men brought the press to perfection. I rebuilt that motor three times before I got it right."

According to McDougall, after this conversation with Rawlinson, he worked on both the motor and the pressing machine. More specifically, in this connection he stated: "Why, I worked Saturday afternoons and Sundays and nearly every evening for an hour or so during the time that this reciprocating press was being brought to a condition where it would press shirts." He also testified that he was at Rawlinson's place of business, working on both devices, at least once a day, for "several weeks".

After the reciprocating pressing machine was perfected, he stated, he asked Rawlinson on two occasions "for some sort of definite arrangement or statement as to how much of it he owned and what we owned and he evaded me." McDougall then went to Rawlinson's plant with Judge Winter and after they, with Rawlinson, had seen the pressing machine work, and "after everybody had expressed pleasure over the machine I said to Mr. Winter in the presence of Mr. Rawlinson that 'We own an interest in that machine.' " Thereupon this conversation followed:

"Judge Winter said to Mr. Rawlinson, 'Is that right?' Mr. Rawlinson said to Judge Winter, 'Yes, that is right, but I don't think you own a half interest, or are entitled to a half interest.' Judge Winter said to Mr. Rawlinson, 'We are only asking what we are justly entitled to.' Mr. Rawlinson and Mr. Winter and I were all present, there is no possibility of any misunderstanding as to what was said."

On cross-examination McDougall thus testified concerning the conference above described:

"On the occasion of Judge Winter's first visit the first conversation was complimentary remarks about the machine and how it worked and then I said to Judge Winter, 'We own an interest in that machine; that is our press motor on it, that is a machine I designed.' Mr. Winter said to Mr. Rawlinson, 'Is that right, Mr. Rawlinson?' Mr. Rawlinson said, 'Yes, that is right, but I don't think you are entitled to a half interest.' Mr. Winter then said words to the effect that we would not ask for more than we were entitled to."

Judge Winter, who had not previously known Rawlinson, testified concerning the meeting had by McDougall, Rawlinson and himself as follows:

"Why, we looked at the machine, then Mr. McDougall stated that 'we', referring to the Oregon Textile Machines, Incorporated, 'had an interest in it.' So Mr. Rawlinson spoke up and said, 'Yes, they have an interest, but you haven't a fifty per cent interest.' And I said, 'Well, we didn't claim a fifty per cent interest, but we would take such an interest as it later developed we were entitled to.' "

He further testified that he saw the machine in operation and that the McDougall motor was furnishing the power for it. He stated that he did not remember whether McDougall mentioned the name of the defendant corporation in the conversation with Rawlinson. He also said that the corporation had expended $186.20 in redesigning the motor to adapt it for operating the pressing machine.

Not long after the conference above mentioned, McDougall, according to his testimony, with Mr. Carter, Judge Winter and Mr. Rawlinson, "met about that machine, at which time Mr. Carter took up the questioning and asked Mr. Rawlinson if it was a fact that we owned an interest in that machine and he said, 'Yes,'

but he wasn't ready to determine what proportionate interest we had."

Concerning that meeting, Judge Winter testified that he was present, that he did not have any conversation with Rawlinson at that time, and that Carter did all the talking. He did not attempt, however, to relate what Carter and the others said.

Carter's account of this meeting is as follows:

"We watched the machine in operation, I say 'We,' the four of us, and after some little time 'Mac' says, 'What do you think of it?' And I said, 'Well, it looks like a labor saving machine to me.' 'Well,' he says, 'that is the machine that we have an interest in.' Now Mr. Rawlinson heard him say that, he was right alongside of me and he heard that remark.

"Q. Did you inquire of Mr. Rawlinson regarding that statement? A. No, I did not inquire from Mr. Rawlinson at that time, no."

The first pressing machine built by Rawlinson is referred to by the witnesses as a "buck" or "two buck" reciprocating press. That machine was the one concerning which the two conferences were held as above described. After testing the first machine Rawlinson, according to McDougall's testimony, was desirous of building what is variously mentioned as a "three buck", "turn-table" or "rotary" press. At Rawlinson's request, McDougall again hired a draftsman for him to draw plans for the new machine. In this connection McDougall testified: "I made all the calculations for strength and choice of materials, and went through the catalogs and bought the proper ball bearings—and I did all the engineering necessary to make it a complete working machine."

In constructing the second pressing machine it was found necessary "to slow the revolving of the spider"

and Melvin E. Dick, a mechanic in the employ of Rawlinson, drew rough plans of a latch which he thought would produce the desired result. These plans were taken by Dick to McDougall, and after McDougall had looked them over he stated, according to Dick, "That will work fine," and "I will work it out for you." McDougall then prepared a design for a different kind of latch, which device, after considerable experimentation, proved satisfactory. He thereupon made application for a patent on it, which was granted. This patent is now owned by the defendant corporation.

After the experimental model of the new pressing machine was completed it became apparent that the motor which had been used for the two buck press was not efficacious with the new machine. Thereupon McDougall, so he testified, completely redesigned the motor.

On May 21, 1937, a meeting was held at the Arlington club, at which were present Rawlinson, his attorney, Christensen, McDougall, Carter and Judge Winter. Carter testified that, "This meeting was called especially because the judge and Mr. McDougall were anxious to get something more specific regarding the interest that we had." He asked Rawlinson "if he would attend" as "we would like to discuss the affairs of the press". Concerning what was said and done at the meeting, Carter's entire testimony is this:

"I spoke first at the meeting there and explained to them that we were—that now the machine was practically a completed unit and that we were anxious to have the matter straightened out as to what our interest represented in the pressing machine. We discussed it as you will talk about these things in a meeting, and the entire conversation was along the interest that we should have."

Although he testified that he was present at the Arlington club meeting, Judge Winter was not questioned as to what took place.

McDougall, after naming those present at the meeting, testified as follows:

"Q. And what generally was the nature of that conversation? I will have Mr. Carter go into more detail on it. A. Mr. Carter and Mr. Rawlinson carried on the most part of the discussion. I think Judge Winter spoke a time or two and I am quite sure that I said nothing about the matter in hand during the discussion and I am also quite sure that Mr. Christensen said nothing."

On cross-examination McDougall gave the following account of the discussion:

"Q. Now at the Arlington club on May 21, 1937, you have told of there being a meeting, now what was said at that time? A. Well, as I tell you in regard to the other conversations, that the principal talk about our relative interests in the matter was between Mr. Carter, who took the lead, and Mr. Rawlinson, who fenced with him and at no time did Mr. Rawlinson suggest or deny that we didn't have any interest, or deny that we had an interest, or suggest that we didn't, but he did say that he had spent a lot of money, the amount he didn't know, and that he wasn't in any position to tell us what our relative proportions should be, but at no time during this meeting was there any denial on Mr. Rawlinson's part that we did have an interest or be entitled to an interest. There was only that he hadn't got it worked out. I am sure he used the expression 'worked out'. I was a very interested auditor, but I didn't take any active part in that conversation."

Rawlinson testified that those above named met at the Arlington club, "under a prearranged plan through the letter from Mr. Carter". After they had luncheon,

according to this witness, "Mr. Carter brought up the discussion that he felt we had ought to do something about coming to some arrangement as to their interest in the machine". Carter and McDougall spent some little time telling the advantages of the press motor and some talk was had concerning the establishment of a factory in Portland, Rawlinson stated. His testimony thus continued:

". . . but the big talk in the meeting seemed to be on the merits of the air press, and the fact that the two patents should be put together.

"Q. Did you enter into the discussion? A. Very little. I had my attorney there to look out for my interests.

"Q. And what was said by Mr. Christensen, your attorney? A. Mr. Christensen seemed to be quite impressed with Mr. McDougall's talk about the air motor, and the fact that they had a patent on their air motor and I recall quite well that he said that it seemed to him that they already had a patent, had a machine that was—as Mr. McDougall stated—was perfect. We just had a machine in an uncertain state. We had had a few claims allowed, but we had had no patent as yet, and I didn't think it would be fair to either side, especially to them, to do anything about it."

Rawlinson also testified that he had never agreed with McDougall to pool his patent with McDougall's, although the matter had been discussed by them. He further declared that he had not made any admissions in conversation with McDougall, Carter or Judge Winter, that they had any interest in his patent or machine, and that any discussion he had with them was with reference to their motor.

Mr. Christensen testified that he attended the luncheon at the Arlington club, at Rawlinson's request, and after luncheon the group retired to a private room,

where Carter "started the discussion with a statement to the effect that the purpose of the meeting was to discuss the interests of the Oregon Textiles and the gentlemen there". His further testimony was as follows:

"Q. (Interrupting) Their interest in what? A. Their interest in their respective patents. The air motor and Mr. Rawlinson's machine. Mr. Carter gave quite a discussion with reference to the possibilities of manufacturing the machine in Portland . . ."

There was discussion also, he stated, concerning the number of machines that could be sold, the number of laundries that might be in the market, "the possible cost of manufacturing and the probable profit to be made" on the machines. McDougall then, according to this witness, "gave quite a lengthy discussion on this motor, and the advisability of Mr. Rawlinson's being hooked up with them in such a way that he would have a means of operating the machine".

On cross-examination Christensen gave the following testimony:

"Q. Well, now, there was some discussion there, Mr. Christensen, that the representatives of the Textile company were claiming some interest in this set-up? A. Absolutely not. Q. They didn't claim any interest? A. No, sir.

"Q. What was the purpose of going over there? A. The purpose of going over there was to see whether or not a company could be organized in which the two patents would be put together, and then a division made of the respective values of the two patents.

＊　　　＊　　　＊　　　＊　　　＊

"Q. Well, that is just exactly it, you were there trying to get together on a proposition? A. Sure, we were there trying to get together on a proposition, that was just the idea exactly, trying to arrive at the value

of one interest against the other, and as to whether or not it was advisable to combine the two and organize a company for the purpose of manufacturing the machine in this city.

*     *     *     *     *

"Q. Mr. Rawlinson testified, if I recall him correctly, that at this meeting you stated that it would not be fair to the Textile company, at least, to put their motor, or their part, in the pot at that time. A. I don't know whether I made that statement, but in substance after Mr. McDougall had praised this motor so much, I told them that I didn't think it was advisable for them to be hooked up with a proposition that was still in the experimental stage, when they had something that was very valuable and on which they had a patent, and which was marketable and could be sold right then.

"Q. You were not advising the Textile company as to what they should do, with Mr. Carter and Judge Winter and Mr. McDougall there? A. No, certainly not."

On May 28, 1937, one week after the Arlington club meeting, McDougall wrote to Rawlinson as follows:

"It has just occurred to me that you should be informed as to the ownership of the legal title to the press motor used on the presses that you invented, as you suggested by telephone day before yesterday that you would probably want to confer with me shortly, concerning the relationship of the motor to your press.

"The legal title is held by Oregon Textile Machines, Inc., of which Mr. Chas. H. Carter is vice-president and business manager, hence any conversations with myself would be to no purpose, since I am not able to make any commitments."

Judge Winter met Rawlinson three times: first, when McDougall took him to Rawlinson's plant; next, when Carter, McDougall and he went together to the plant; and the third time, at the Arlington club. He

did not testify to any conversation with Rawlinson except that had at his first meeting with him.

On cross-examination McDougall testified concerning conversation with Rawlinson, as follows:

"Q. Now, during 1937, we will say, did Mr. Rawlinson have any conversation with you personally relative to your respective interests in this unit? A. No.

"Q. Did he talk to you at all about it? A. He never did volunteer anything. Q. That is not what I mean. A. No, after the conversation I have already related the matter was turned over to Mr. Carter and he handled that exclusively."

The meetings to which McDougall referred were that of early March, 1936, at which an understanding, he claimed, was reached between himself and Rawlinson as to the pooling of their patents, and the other three meetings which have above been mentioned.

After Carter's first visit to the Rawlinson plant on the occasion of the meeting of the stockholders of the defendant corporation with Rawlinson, he did not see Rawlinson "for perhaps five or six or seven weeks". He testified that on his first visit after McDougall took him to the plant he "dropped in casually to see how the machine was working and to see if everything was going along smoothly". Rawlinson then told him, "there were quite a few bugs, as he called them, in the machine, and he was working on them constantly and he didn't think that it was really in a perfected state yet." In this connection he thus further testified:

"And a few weeks would elapse between the visits. The next visit, that would be the third visit with him, I talked about our interests, and after that trip every visit that I made to Mr. Rawlinson there—and I must have made between perhaps September and September, I must have made ten or twelve visits—and we discussed business in general, we discussed the machine,

we discussed the methods of merchandising the machine, whether it was advisable that we should attempt to sell the machine as a machine or attempt to build the machine, and at no time did Mr. Rawlinson ever deny that we had an interest in it. Several times I talked about our interest and he said, 'Well, let's get along. There is going to be lots of money in this for everybody, it is going to be a big thing and you needn't worry about the interests, they will be taken care of.'

"Q. Now, at any time did you discuss any particular percentage with Mr. Rawlinson? A. Only once there he spoke to me. We was up there in his office and he says to me, 'What kind of an interest do you feel that you should have in this machine?' I said, 'Well, we recognize the fact that you have the lion's share of this machine, that you have done most of the work and that it is your baby up to a certain point. I think we should have about a twenty-five per cent interest in the machine.' "

The record does not disclose, so far as we have been able to ascertain, what answer Rawlinson is reported to have made to this proposition by Carter.

The mechanic Dick, whose testimony has already been mentioned, stated that he had been following his trade for about 20 years; that he had worked for the laundry owned by Rawlinson and his son for nine years; that during two and a quarter years of that period he had spent 90 per cent of his time working on the two pressing machines being perfected by Rawlinson; that while so working he "had a machinist and a couple of mechanics" helping him on occasions; and that during all the time when both types of pressing machine were being constructed he worked on them. He stated that he had not seen McDougall at the Rawlinson plant more than twelve times. His further testimony was as follows:

"Q. Was there anything connected with the work that called for him [McDougall] to be there? A. Absolutely none, outside of his air cylinder; I called him over a couple of times on his air cylinder after we got it running.

"Q. He spoke of putting on working clothes and working there one day, did that ever happen, do you know? A. He done it once there, working on his own cylinder, getting it worked out.

\* \* \* \* \*

"Q. What has been the work that has taken up the most of the time in getting this machine perfected, that is, on what part of it has the chief difficulty been encountered? A. The steam chests and the buck.

"Q. Has Mr. McDougall been working on those? A. He never helped us on those at all.

"Q. Has he had anything to do that you know of with the perfecting of the buck. A. None whatsoever.

"Q. Did he have anything to do with the putting of that brake on the machine? A. None.

"Q. When Mr. McDougall would come over on the occasions you have mentioned, how long would he stay? A. Oh, he was never there very long at a time. I don't think over twenty or thirty minutes at the most at any time, maybe just a little longer but he was there very little."

Joseph Schulein, a mechanical engineer, was employed by Rawlinson for about three months beginning in late March or early April, 1937, to work on the rotary pressing machine. He had to do principally with the designing of an automatic control, which he completed and installed. Prior to that time the machine was "being set up to be operated by foot pedals and rotated by a girl who operated the buck by pushing the rotating bucks into position". During the time that he was employed at the plant, this witness testified, McDougall was there possibly three times, and on those occasions discussed the machine with him. Twice Schulein went

to McDougall's office, he stated, at Rawlinson's request, on a "private matter between Mr. Rawlinson and Mr. McDougall".

Rawlinson testified that he had spent many years and approximately $20,000 in cash on his invention and in perfecting the two types of pressing machine. He further stated that the cost of building a single machine such as those he constructed would be about $2,000.

McDougall testified that he had spent approximately $400 in redesigning his motor three different times to adapt it to the two types of machine built by Rawlinson. The value of his services in connection therewith he estimated at $50.

On or about September 29, 1937, Rawlinson left Portland for the East, to attend a laundrymen's convention at Cleveland, Ohio. A day or so before leaving Portland he requested Carter, according to the latter's testimony, to come to his office for a conference. Carter complied, and Rawlinson on that occasion told him that he was going East to attend the convention and would "try to do something with the machine". At that conference, Carter testified, they "discussed the matter about the price, and the method of handling the machine here as we had discussed it many, many times before; the advisability of building the machine, or building the machine and distributing it with a new company that would be formed for handling the product. That was discussed not once but many, many times, as was the matter that if we should sell the machine what should we ask for it."

According to Carter, he suggested to Rawlinson that "we should ask around a hundred thousand dollars, not to exceed a hundred thousand dollars for the ma-

chine, with a seven and one-half per cent royalty, and not less than twenty thousand or twenty-five thousand dollars a year during the life of the patent as the money they should pay." Rawlinson is reported by Carter as having answered that the "down payment" suggested by Carter was not enough.

The question of possibility of financing a corporation for the manufacture of the machine was discussed, Carter testified, and he suggested seeking the advice of Mr. Willis K. Clark, who "had a lot of experience in financing". A conference was had with Mr. Clark and he wrote a letter dated September 29, 1937, to Rawlinson, in which he expressed the opinion that he probably could arrange financing for the manufacture of his pressing machines. The purpose of this letter to Rawlinson was, according to some of the testimony, to influence a possible buyer of the patent in the East, rather than to give assurance that financing could actually be furnished by Clark.

With reference to what was said at that conference as to the ownership of the machine, Clark testified:

"Q. Now, I wish you would tell the court right here what was said by Mr. Rawlinson in your presence, or by Mr. Carter bearing upon the ownership of the machine in any form, shape or manner. A. Well, I don't recall any special statement. We were all talking about this machine, and it was always 'our machine' and 'What will we do with this machine?' I don't recall, it is a long time ago and I recall the general tenor of the conversation, but Mr. Carter never said, 'This is my machine,' or Mr. Rawlinson never said, 'This is my machine' or anything like that, it was just, 'What will we do with developing this machine we have got?' "

Rawlinson attended the Cleveland convention but did not ship his machine there for demonstration. He did, however, while there, contact representatives of

American Laundry Machinery Company and Troy Laundry Machinery Company, the only concerns likely to be interested in purchasing or handling his machine. After he returned to Portland the American company wrote to him, under date of October 13, 1937, stating that it expected "to send one or more persons to Portland to make observations of the performance and possibilities of your shirt press". It was also stated in this letter that if the report of those men should be favorable, that company would draw up the draft of a proposed agreement upon certain terms mentioned in the letter.

Representatives of both the American and the Troy companies visited Portland and inspected the pressing machine. While in Portland, according to Rawlinson, representatives of the Troy company had a conference with officers of the defendant corporation.

On November 3 the American company wrote Rawlinson, stating that its representatives had returned to Cincinnati and that "while they report certain features of the press will require further development that will involve considerable expense, their report in the main is encouraging enough for us to say that we are prepared to enter into an agreement with you on the basis of the terms outlined in our letter of October 13, 1937". The letter further states that it would be advisable for Rawlinson "to ship us the machine you now have in operation in your plant."

Without consulting any of the defendants, Rawlinson shipped to the American company one of his pressing machines, which had attached to it the McDougall motor and the latch on which McDougall had obtained a patent.

Rawlinson made a second trip East, to see about the sale of the machine, and returned to Portland early in November, 1937. On November 9 Carter had a conference with Rawlinson at the latter's plant. He testified that he was received coldly and not as formerly. Asked what occurred at that meeting, Carter testified as follows:

"* * * I asked him, I says, 'Well, Mr. Rawlinson, what did you do about the machine?' And he said, 'There wasn't very much done about it.' He says, 'I don't think that they are going to be very much interested in it.' He says, 'I might interest them in my machine, but the people I showed it to are not interested in your press motor. So that lets you out.' So I says, 'What do you mean it lets us out?' 'Well,' he says, 'any arrangements that we had was for the press motor and,' he says, 'I am not going to be able to do anything with the machine with the press motor, so as far as you are concerned you have no interest in the machine from now on.'"

Rawlinson testified that the American company did not want the motor and "shipped it right back to us"; that he had told that company that he did not own the motor; and that the American company advised him that McDougall had attempted to, sell the motor to it, but it refused to buy. He also stated that when representatives of that company came to look at his machine he told them that he did not own the motor, but that it was available if they cared to buy it. Rawlinson further testified that on his return from the East, in his conference with Carter, he told Carter that the American company had informed him that it did not want the motor, because it had motor presses of its own.

On November 12, three days after Carter's conference with Rawlinson, he, as an officer of the defendant corporation, wrote to Rawlinson in part as follows:

"After my conference with you on Tuesday of this week, I deemed it advisable to call a meeting of the stockholders of the Oregon Textile Machines, Inc., as I was a little surprised at your statement that Oregon Textile Machines had no rights in the automatic shirt pressing machine except the motor attached to the machine and that our interest could be determined only if a company was formed to manufacture the machine and exploit sales direct, that if you sold the machine to either the American Laundry Machine Company or the Troy Laundry, they would have no interest in taking over our air compressing machine in conjunction with the automatic shirt press.

"My understanding with our engineer, Mr. McDougall, had always been that our automatic compressing machine was to become a part of your machine and if and when a sale was made of this machine, or if we should eventually decide to build and exploit the machine, that we would have a substantial interest in the entire machine. My calling our stockholders together was for the matter of confirming my understanding."

The letter continues with a reference to what Mr. Carter states was apparently the understanding of McDougall and Judge Winter, and enlarges upon the work which had been performed by McDougall in "engineering and designing on both machines" and in redesigning the motor and obtaining a patent on the latching device. Mr. Carter also referred to the materials furnished to Rawlinson by the defendant corporation. His letter ends as follows:

"In view of our understanding I feel that the shirt pressing machine, if sold, should be sold as a whole and not as a part, and the machine should not be offered for sale without a conference with our company so the price to be established would be satisfactory to us that we may be fully recompensed for our interest. There is no doubt it was thoroughly understood by Mr. Mc-

Dougall and Mr. Winter, as well as myself, that we have a substantial interest in the machine so I feel that we should get together for a conference at an early date in order that our rights might be fully protected.''

On November 30, the defendant corporation wrote to both the American company and the Troy company, stating that it was understood by the corporation that Rawlinson was negotiating for the sale or lease of an automatic shirt pressing machine; that the defendant corporation was the owner of ''certain rights and patents in this machine and up to this time no arrangements have been made to transfer the rights to Mr. Rawlinson. We vigorously oppose the sale or lease of this machine until such time as satisfactory arrangements have been made between Mr. Rawlinson and our company to protect our interests.''

Under date of January 21, 1938, American Laundry Machinery Company entered into a contract with Rawlinson and his son, Richard Rawlinson, whereby the Rawlinsons granted to the American company the exclusive right, license and privilege to make, use and sell machines or apparatus embodying the ''Rawlinson inventions as set forth in said applications and letters patent''.

The applications for letters patent were designated in the contract by serial numbers, three in all. One of the numbers was that of the application for the patent that was later issued to Rawlinson for the pressing machine. The other two numbers were not referable to the McDougall latch or motor and we are not here concerned with them.

One of the terms which the American company imposed upon the plaintiff as a condition to paying the consideration named in the contract was that the plain-

tiff should establish by court decree or otherwise that neither Oregon Textile Machines, Inc., McDougall nor their associates had any ownership, interest or rights "under the said inventions and applications by or on behalf of the Rawlinsons."

This suit was therefore instituted by Rawlinson to quiet his title to the patent issued to him by the United States patent office August 9, 1938, pursuant to the application filed by him November 30, 1935. It is admitted by the defendants that they have no interest in the patent the title of which the plaintiff seeks to quiet against their asserted claims.

Although the complaint was limited to the quieting of plaintiff's title to this patent, the answer and reply thereto raised the issue of whether the defendant corporation had any interest in and to the pressing machine developed by Rawlinson. And the circuit court seems to have assumed, as apparently did the litigants also, that the defendant corporation's claim to an interest in the machine embodying plaintiff's inventions was a matter which should be considered and determined in passing upon the question of plaintiff's exclusive right to the patent issued to him.

The circuit court in its decree found that, "the plaintiff has not sustained the allegations of his complaint and therefore is not entitled to the relief prayed for therein, and that the defendants have sustained the allegations of their further and separate answer and defense, and are entitled to relief as therein prayed for", and ordered that plaintiff's suit be dismissed.

The defendants allege that the defendant corporation entered into a definite contract with the plaintiff whereby it was agreed between the parties "that the garment pressing machine and safety press motor and

shock-absorbing latch device were to be treated as component parts of a single unit in connection with the device referred to in plaintiff's complaint'', and that the defendant corporation was to have ''an equitable interest in the aforesaid garment pressing device as herein alleged''. The defendants' contention, in the language of some of their witnesses, is that the pressing machine patent and the patent on the McDougall motor were to be ''pooled'', so that the defendant corporation would have an interest in the pressing machine.

It is conceded by the defendants that the alleged agreement which they contend was entered into between the defendant corporation and Rawlinson was not definite enough to be enforceable, for the reason that the parties thereto had not agreed upon the amount of the interest which the defendant corporation was to have in the pressing machine. They do, however, contend that there was a definite understanding between the defendant corporation and Rawlinson that the corporation was to have some interest, the amount of which was to be determined at some later date; that the plaintiff has ignored the defendant corporation's interest in the pressing machine, in his dealings for the disposal of his patent rights; and that such action on the part of Rawlinson is inequitable and unjust, with the result that he is not entitled to relief, since he does not come into court with clean hands.

The first question presented is whether the plaintiff entered into a contract with the defendant corporation as alleged in the defendants' answer. In determining that matter it is necessary to scrutinize closely the transactions recounted in the record.

We find from the evidence before us that McDougall was hired by Rawlinson to procure a patent on a garment pressing machine. While working on the specifications of claims to be filed in the patent office, or shortly thereafter, McDougall, according to his own testimony, realized that Rawlinson's inventions were entirely different from any others theretofore patented, and he thereupon orally proposed to Rawlinson that he be granted an interest in the patent in exchange for his services. He testified that Rawlinson accepted this proposition. Then came the letter from McDougall to Rawlinson's attorney, containing definite terms of an agreement which he was submitting to Rawlinson, and proposing that McDougall be granted a one-sixteenth interest in Rawlinson's patent. This proposal was rejected by the attorney and McDougall acquiesced in the latter's views.

Prior to this communication between McDougall and Christensen, McDougall, at the instance of Rawlinson, had engaged a draftsman to prepare plans for a model machine, and in his letter to Christensen McDougall stated the amount he claimed as his fee for supervising the drafting of those plans. Therefore, at the time that the agreement is alleged to have been entered into, early in March, 1936, McDougall was retained by Rawlinson not only as a patent attorney but also as a mechanical engineer.

Before considering the purported agreement it is well to observe that McDougall testified that the agreement which he had with Rawlinson as to his interest in the patent was abandoned, and that he was not claiming anything by reason of such understanding. It was on or about March 12, 1936, that the plaintiff is claimed by the defendants to have entered into a contract with

the defendant corporation. Yet at that time Rawlinson did not know that there was such a corporation in existence, and did not learn of that fact until a year or so later.

McDougall received notice of the rejection of the claims of patentability included in Rawlinson's application about February 22 or 23, 1936. He did not notify Rawlinson of the rejection until about March 10, when the pressing machine was to be tested; and, according to McDougall, "by a coincidence" Rawlinson learned of the rejection of his claim for patent at the very time that the first test of the machine proved it unsuccessful. It would appear from the record, however, that the failure of the machine to operate satisfactorily was due in large measure to the inefficiency of the McDougall motor, which had been installed at the instance of McDougall, on his representation that it would prove adequate. The McDougall motor had demonstrated in experiments that it was not suited to the work for which it had been intended, and at this time McDougall or the defendant corporation had on hand twenty-five of the motors, which could not be sold.

McDougall, who had unsuccessfully made two previous attempts to obtain an interest in Rawlinson's patent, embraced the opportunity created by this situation to press again his request for a share in Rawlinson's machine. He is the only witness on behalf of the defendants who testified concerning the terms of the alleged agreement then effected. Corroboration of his testimony in this connection was attempted by introduction of the testimony of Carter and Judge Winter as to admissions made by Rawlinson that they had an interest in the pressing machine, at the time

they saw it in operation with the McDougall motor attached. Rawlinson, however, denied that there was ever any such agreement.

The allegations of the answer setting forth the terms of the agreement between the plaintiff and the defendant corporation have hereinabove been quoted. One of the considerations for entering into an agreement, according to the allegations, was the inventing and patenting of a shock-absorbing latch. This latch, however, was not thought of until almost a year after the conclusion of the alleged agreement.

The pressing machine first perfected by Rawlinson required a latch in its operation, and this latch was designed and installed by Dick and other employees of Rawlinson, without the assistance of McDougall.

After stating what his understanding with Rawlinson was, McDougall gave the following testimony on direct examination by his counsel:

"Q. Now, did you agree to do anything further than merely work on the motor in connection with this talk that you had with Mr. Rawlinson? A. I agreed to bring the reciprocating buck press to a state of perfection with an adequate motor on it that would press shirts as good as could be expected. I did that— that is, Mr. Rawlinson's men brought the press to perfection. I rebuilt that motor three times before I got it right.''

By his own words, not McDougall, but Rawlinson's men, brought the press to perfection.

After the alleged entering into an agreement in the early part of March, 1936, and after the reciprocating machine was perfected, McDougall attempted to ascertain from Rawlinson "how much of it he owned and what we owned, and he evaded me''. Thereupon Mc-

Dougall, to quote his own testimony, "went to see Judge Winter and asked him if he would try his luck and I asked Mr. Rawlinson over the telephone for permission to bring Judge Winter and he said he would be glad to."

It was sometime in June, 1936, that Judge Winter and McDougall went to see the experimental pressing machine in operation. Both McDougall and Rawlinson were very deaf and were observing the machine amid the noises incidental to its operation and the usual noises of the laundry. McDougall then, he testified on cross-examination, remarked to Judge Winter that, "We own an interest in that machine; that is our press motor on it, that is a machine I designed." McDougall testified that Judge Winter asked Rawlinson, "Is that right?" Rawlinson's answer, according to McDougall, was, "Yes, that is right, but I don't think you own a half interest, or are entitled to a half interest." Judge Winter testified that McDougall did the questioning and when he made the statement about the defendants' interest in the machine, Rawlinson "spoke up and said, 'Yes, they have an interest, but you haven't a fifty per cent interest.' "

Not satisfied with the alleged admissions made by Rawlinson to him and Judge Winter, McDougall, shortly after that visit, made it a point to take both Judge Winter and Carter with him to see Rawlinson; and after observing the machine in successful operation, McDougall testified, Carter questioned Rawlinson, asking him first if it was a fact that "we own an interest in that machine". Carter states that McDougall did the talking, and according to Carter's testimony Rawlinson did not say anything in answer to the remarks made by McDougall. Judge Winter did not

give any evidence as to what was said or done on that occasion.

A long time elapsed between that meeting in June, 1936, and the next meeting of the stockholders of the defendant corporation with Rawlinson, in May, 1937, at the Arlington club. In the interim Rawlinson had come to the conclusion that the two buck reciprocating machine was not satisfactory and had set about to develop a three buck, turn-table type or rotating, pressing machine. In building the new press it became apparent that some sort of latch was necessary, and the mechanic Dick drew rough plans of a latch that he thought would fill the requirement. McDougall, after expressing his opinion that the Dick latch would "work fine", over the week-end prepared plans for a different latch, and on March 9, 1937, filed an application in his own name for a patent on the latch.

The conversation and discussion at the Arlington club meeting on May 21, 1937, are referred to by the defendants as very important. Judge Winter, although then present, was not asked what was said or done at that meeting. Carter gave no definite account. McDougall testified that during the meeting, "at no time did Mr. Rawlinson suggest or deny that we didn't have an interest, or deny that we had an interest, or suggest that we didn't." Christensen's testimony concerning the meeting is the most satisfactory. We need not quote it again. His account was that the stockholders of the defendant corporation did not at that time "claim any interest in the machine", but rather, the whole discussion turned upon whether it was advisable to combine the two patents and organize a company for manufacturing the pressing machine in Portland.

It is quite significant that a week after that meeting McDougall wrote to Rawlinson, making a point of informing him as to the ownership of the patent on the motor and stating that the defendant corporation owned the legal title to it. This indicates that McDougall, at least, thought that Rawlinson did not know that the defendant corporation was the owner of the motor patent. It is altogether inconsistent with the contention that Rawlinson had prior thereto contracted with the defendant corporation on the terms alleged.

Likewise inconsistent with the defendants' allegation that a contract had been entered into is the reference in that letter to a recent telephone conversation between McDougall and Rawlinson, to the effect "that you [Rawlinson] would probably want to confer with me shortly concerning the relationship of the motor to your press". Also incompatible with McDougall's testimony as to a previously concluded contract is his further statement in that letter that he was "not able to make any commitments".

Attention should also be directed to the letter written by Carter to Rawlinson on November 12, 1937, on behalf of the defendant corporation, in which Carter refers to the understanding he had with McDougall, not Rawlinson, regarding the interest of the defendant corporation in the pressing machine. He makes no claim in the letter that Rawlinson had admitted that the defendant corporation had an interest in the machine.

In our opinion, there was never any definite agreement, such as alleged by the defendants, entered into between Rawlinson and McDougall or between Rawlinson and any of the officers of the defendant corporation. Nor did Rawlinson ever agree with McDougall

that either McDougall or the defendant corporation should have an interest in the Rawlinson pressing machine. At no time was Rawlinson the moving party. It was at McDougall's suggestion that the latter's motor was used in experimenting with the pressing machine. McDougall saw the possibility of a sale of his motor and was willing, even anxious, to redesign his motor to adapt it for use with Rawlinson's machine. But at no time was there any agreement between Rawlinson and the defendants, or any of them, that the motor patent and the pressing machine patent should be pooled and sold as a unit.

We find in the case no wrongdoing or injustice on the part of the plaintiff toward the defendants or any of them. He has been guilty of no inequity or misconduct that could have brought about the situation of which he now complains. While we agree that one who seeks equitable relief must come into court with clean hands, the facts in this case do not indicate that the plaintiff's hands are otherwise than clean.

It results that the decree appealed from must be reversed and one entered quieting the plaintiff's title to the patent referred to in his complaint and enjoining the defendants and each of them from claiming any right, title or interest in or to such patent or to the machine or apparatus embodying the plaintiff's inventions covered by his patent.

In his reply the plaintiff has offered to pay to the defendants or any of them any just claim that they or any of them may have against him for services performed or materials furnished. The cause is therefore remanded to the circuit court, with permission to the

defendants or any of them, if they so desire, to have determined the amount, if any, in which the plaintiff is indebted to them. In the event of such further proceedings, the parties may amend their pleadings to present the issue of that indebtedness, if any.

Costs in this court will not be allowed.

RAND, C. J., and BELT and LUSK, JJ., concur.