Argued June 7, 1978, affirmed in part; reversed in part
and remanded January 16, 1979

CHVATAL, *Appellant, Cross-Respondent,*
*v.*
UNITED STATES NATIONAL BANK
OF OREGON,
*Respondent, Cross-Appellant.*
(TC A7603-03067, SC 25359)

589 P2d 726

Charles Robinowitz, Portland, argued the cause and filed briefs for appellant, cross-respondent.

Richard C. Josephson, of Davies, Biggs, Strayer, Stoel and Boley, Portland, argued the cause and filed briefs for respondent, cross-appellant.

Before Denecke, Chief Justice, and Tongue, Bryson, and Linde, Justices.

LINDE, J.

**LINDE, J.**

Plaintiff was a department manager of Richard Abel and Company, a distributor of books and library services, when defendant bank took control of the company's business operations in order to protect its interests as a creditor of the company. He brought the present action for unpaid vacation and severance benefits which defendant allegedly promised to pay. Plaintiff won a jury verdict on this claim. He appeals from the trial court's denial of attorney fees. Defendant cross-appeals from the judgment entered on the verdict. Since the claim for attorney fees depends on the outcome of the cross-appeal, we consider the latter first.

■ By several assignments of error defendant contends, in effect, that the evidence does not support finding a promise by defendant to pay plaintiff the claimed benefits, and that if there was such a promise, it was not supported by consideration. There is evidence to show the following facts:

In October, 1974, Ernest McDougal, an officer of the bank, established a full-time office at the Abel company to "monitor" the operations and eventual liquidation of the company. Thereafter, all of Abel's expenditures, including its payroll, had to be authorized by McDougal; only additional advances by the bank enabled the company to meet any expenses. On January 8, 1975, Abel formally gave the bank control of all assets in which the bank claimed a security interest. The next day, McDougal issued the following memorandum:

January 9, 1975

TO:  Employees of Richard Abel & Co., Inc. and Subsidiaries:

On January 8, 1975 the Company turned over to the United States National Bank of Oregon, all assets for which the Bank claims a security interest. The

[13]

Bank's staff will assume control for the purpose of disposing of such assets in the best possible manner.

During this period of time many employees of the Abel Company and Subsidiaries will be required to accomplish this operation. A statement will be issued shortly by our Personnel Department, which I trust will answer many of the questions you may have during this period of time.

The Bank, my staff and myself take this opportunity to say "Thank You" for your past assistance and cooperation. I sincerely hope we may expect the same in the future.

s/ E A McDOUGAL<br>
United States National Bank of Oregon<br>
E. A . McDougal<br>
Asst. Vice President

Four days later, the company's personnel manager distributed to the employees a second memorandum, which read as follows:

To:     All Staff Members          January 13, 1975

From:  Bob Himmelright
        s/ BOB

CURRENT STATUS OF BENEFIT PLANS

The current status of the Benefit Plans is as follows:

·   Group Insurance Plan

* * * * *

Vacation Pay

Staff members retained by the Bank will receive pay for their accrued vacation upon satisfactory completion of the disposal of assets by the Bank. Those staff members who have not been retained by the Bank will not receive pay for their accrued vacation.

[14]

### Severance Pay

The provisions related to pay for accrued vacation as noted above also apply to Severance Pay.

The terms and conditions of the foregoing policy will be based on the Bank's being in control of the entire operation until it is successfully completed.

Defendant bank assigns as error the trial court's failure to direct a verdict in its favor for lack of evidence that the bank authorized Abel's personnel manager, Robert Himmelright, to make the foregoing statements about vacation and severance pay for employees retained during the period of liquidation. Himmelright's testimony was equivocal whether he had sent out the memorandum of January 13 as a follow-up to the January 9 memorandum or not, and whether he did it on his own initiative as the company's personnel manager or with McDougal's authorization. He initially testified that McDougal had not asked him to write the memorandum. Reminded of certain statements in his pretrial deposition and in a letter he had written to plaintiff's attorney, he later stated that McDougal did ask him to write a letter or memorandum concerning the payment of employee benefits. He also testified that he left the memorandum on McDougal's desk with a note requesting that it be reviewed, and that it was returned to him through company channels, though not by McDougal personally, leading him to believe that it had been approved. McDougal testified that he did not recall either directing Himmelright to prepare the memorandum or having seen it prior to the litigation. Another witness testified, contrary to McDougal's recollection, that at a staff meeting on January 9, McDougal had stated that the bank would pay the accrued vacation and severance pay of staff members who stayed on to assist the bank in disposing of Abel's assets. In view of the contradictions in the testimony, the trial court did not err in leaving to the jury the question whether McDougal had authorized the substance of the

January 13 statement concerning the benefits in issue either before or after Himmelright wrote it.

Also in support of its motion for a directed verdict, defendant quotes testimony by Himmelright that the January 13 memorandum was not intended to extend the stated benefits to employees who would be retained by the eventual purchaser of Abel's assets, Blackwell North America. This may be so, but nothing in the memorandum suggests that an employee "retained by the bank" would lose his benefits if he was offered continued employment by the purchaser but declined, as plaintiff did.

■ Nor did the court err in refusing to withdraw the case from the jury on the issue of consideration. Defendant contends that, if a promise to pay vacation and severance benefits was made, it lacked consideration because plaintiff had already told his supervisor he would remain on the job during liquidation on January 8, before the first memorandum. However, even if we were to accept defendant's assumption that plaintiff's statement to his supervisor obligated him toward the Abel company, this alone does not prevent his subsequent performance of his work from being consideration for the promise of a third party, which had an independent interest in his performance of that work, to see that the compensation earlier promised by his financially incapacitated employer would in fact be paid. *See Enco, Inc. v. F. C. Russell Co.,* 210 Or 324, 338-339, 311 P2d 737 (1957). We conclude that defendant's promise of January 13 to all retained employees that it would honor their vacation and severance benefits was supported by consideration with respect to employees who continued to work, whether or not they individually relied on this promise in making their decisions.

■ We turn to plaintiff's appeal from the denial of attorney fees. Plaintiff claims a right to such fees under ORS 652.200(2), which allows "a reasonable

[16]

sum for attorney's fees" in "any action for the collection of wages" not paid within 48 hours after becoming due. The dispute is not whether unpaid vacation and severance benefits can be "wages" under this section, *see State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 432 P2d 512 (1967), but whether plaintiff's claim against the bank was an "action for the collection of wages." Defendant contends that ORS 652.200 relates only to actions against an employer, but the statute does not say so.[1] Defendant also argues that plaintiff himself characterized his action as one for breach of an agreement, not for wages.

In *Carlson v. New Amsterdam Casualty Co.,* 118 Or 542, 247 P 804 (1926), this court applied a predecessor of ORS 652.200 when the action was against a surety of an employer who had failed. Of course, unlike that surety, the present defendant had not bonded itself to meet the employer's obligations to its employees. However, if defendant is liable for plaintiff's vacation and severance pay at all, as the jury found, it is either because defendant agreed to stand behind the employer's promise, which puts it in the same position as the surety in *Carlson,* or because it made an independent promise to compensate those of Abel's employees which it chose to retain for its own purposes. On either theory, if an employee had sued the bank for payment of ordinary wages earned but not paid during the period when the bank was in complete control of the company's assets and of all payments made from them, it would be hard to characterize such an action as something other than an "action for the collection of wages" within the meaning of ORS

---

[1] Defendant argues that ORS 652.200 only governs procedure for the enforcement of ORS 652.140, which defines when wages are due and payable after an employee quits or is discharged, and ORS 652.150, which provides that unpaid wages continue to accrue as a penalty for wilful failure to pay them when due. But the provisions requiring payment are written in the passive voice, arguably applicable to anyone who may be liable for the unpaid wages. Only the final provision of ORS 652.150 gives a defense against the penalty on the ground of financial inability specifically to the employer.

652.200(2). Under the holding of *State ex rel Nilsen v. Ore. Motor Ass'n, supra,* it cannot be characterized differently because the claim is for unpaid vacation and severance benefits rather than basic salary. Accordingly, the case must be remanded for determination of plaintiff's claim of attorney fees.

Affirmed in part; reversed in part and remanded.