Argued and submitted January 15, resubmitted In Banc August 15, affirmed on appeal,
reversed and remanded on cross-appeal October 16, reconsideration denied December
6, 1985, petition for review denied January 28, 1986 (300 Or 506)

# KANTOR,
*Respondent - Cross-Appellant,*

*v.*

# BOISE CASCADE CORPORATION,
*Appellant - Cross-Respondent.*

## (A8210-06200; CA A32360)

708 P2d 356

Gregory R. Mowe, Portland, argued the cause for appellant - cross-respondent. On the briefs were Charles F. Adams, Christine Kitchel, and Stoel, Rives, Boley, Fraser & Wyse, Portland.

Richard O. Thomas, Portland, argued the cause for respondent - cross-appellant. With him on the brief were Linda K. Eyerman and Gaylord & Thomas, P.C., Portland.

RICHARDSON, J.

## RICHARDSON, J.

Plaintiff brought this action against defendant, his employer, to collect pension benefits allegedly owed to him. The action was brought in two counts, the first for breach of contract and the second for unpaid wages. The case was tried to a jury. The court directed a verdict against plaintiff on the second count and submitted the case to the jury on the first. The jury returned a verdict for plaintiff, and the trial court entered a judgment accordingly. Defendant appeals that judgment, and plaintiff cross-appeals the directed verdict on the second count. We affirm on the appeal and reverse and remand for a determination of plaintiff's attorney fees on the cross-appeal.

Plaintiff's claims were based on an alleged agreement with defendant that defendant would credit him with continuous service from 1938 for purposes of calculating his pension benefits.

In 1938, plaintiff began working for the Minnesota and Ontario Paper Company, which defendant purchased in 1964. By 1965, plaintiff had been promoted to the top hourly paid position for which he was qualified, and he anticipated no openings in the salaried positions for which he might qualify. He therefore left defendant's employ in September, 1965, and began working for a different paper company. He became disenchanted with that job and later learned of an opening in a salaried position as an instrument supervisor at defendant's St. Helens mill.

Around June or July, 1966, he visited the mill for an interview. Platt was the plant engineer; Webber was the mill manager and Platt's superior. Platt interviewed and recommended persons for employment, but Webber had the ultimate authority to hire. Plaintiff first met informally with Platt. He told Platt that, if he took the job, he wanted to be credited with continuous service since 1938 for the purposes of calculating employe benefits. He asked that his ten-month break in employment with defendant be disregarded when calculating the benefits.

The following day, plaintiff toured the mill and had lunch with Platt, Webber and another employe. When plaintiff's request for continuous service was raised, Webber asked

Platt to meet him in his office after lunch to discuss it. At that meeting, involving only Platt and Webber, Platt recommended that plaintiff be hired and that he be credited with continuous service since 1938. Platt testified that he understood that to do so meant that plaintiff's break in employment would be disregarded and his 1938 hire date would be used to calculate his benefits, including his pension. Both Platt and Webber recall discussing vacation benefits at the meeting, but neither recalls specifically discussing pensions. Webber approved plaintiff's request, and Platt relayed that approval to plaintiff and offered him the job. Platt does not recall telling plaintiff that approval would be required from defendant's headquarters in Boise, but he may have said that headquarters would be notified. Plaintiff testified similarly. He accepted the job offer and was rehired, effective July 11, 1966.

Under the pension plan then in effect for salaried employes, benefits were calculated on the basis of years of service. Employes who were rehired after having been terminated before becoming eligible for benefits would be considered new employes and would not receive credit for previous periods of employment with the company. Under the vacation policy for salaried employes then in effect, employes with 20 or more years of continuous service were entitled to four weeks of paid vacation. Those with ten years or more were entitled to three weeks, and those with less were entitled to either one or two weeks. The vacation policy provided that employes who were rehired after leaving the company's employ would be entitled to vacation on the basis of their most recent hiring date.

After plaintiff returned to work in July, 1966, he began to receive four weeks' paid vacation, the amount he was entitled to if he were credited with continuous service since 1938. Other employes asked him why he was entitled to four weeks' vacation, and he told them about his agreement with Platt and Webber. He became concerned about their questions and that the agreement was not in writing. He discovered that neither the personnel office in St. Helens nor defendant's headquarters had any record of the agreement. Apparently in response to his inquiry, defendant's pension administration office sent him a memorandum in February, 1974, stating that his rehire date of July 11, 1966, would be

used to calculate his pension benefits. The memorandum did not mention the agreement with Platt and Webber. On January 30, 1976, plaintiff wrote to the pension administration office concerning the agreement:

> "* * * On July 8, 1966 I rejoined Boise Cascade as Instrumentation Supervisor at St. Helens. At that time, Mr. Don Platt, Plant Engineer, answered my question on vacations and retirement as, yes, we can grant four weeks vacation, but retirement is handled by Headquarters and we will work on it. I have enjoyed the four weeks vacation each year, but unfortunately and regretfully, did not follow up on the pension and little, if any, work was done on it."

Defendant's response did not mention the agreement or directly state that the agreement would not be honored, but it did indicate that plaintiff's pension benefits were, at that point, being calculated on the basis of his rehire date. In March, 1976, plaintiff received a computer printout concerning his pension benefits, which showed that his benefits were being calculated on the basis of his rehire date.

Plaintiff worked for defendant until April, 1982, when he retired at age 62. He applied for pension benefits, indicating a hire date of 1938. Defendant refused to honor the alleged agreement on the ground that Platt and Webber had no authority to make any agreements concerning pensions and, therefore, as provided in the pension plan then in effect, calculated his pension from his rehire date.

The first assignment of error raises the issue of whether plaintiff's action is barred by the time limitation of ORS 12.080(1), which provides, as relevant, that "[a]n action upon a contract or liability, express or implied, * * * shall be commenced within six years." The Statute of Limitations begins to run when the cause of action accrues. ORS 12.010. Defendant argues that, if a valid agreement existed, it was breached as early as February, 1974, and no later than March, 1976, because during that period it had notified plaintiff that his pension benefits would be based on the 1966 rehire date, thus showing that it had not credited him with continuous service. The limitation period would have expired no later than March, 1982, and plaintiff's October, 1982, action would be untimely.

■■■. Essentially, defendant argues that there was a breach

of the contract or an anticipatory repudiation of the agreement by March, 1976, and the cause of action accrued at that time. It is evident, however, that plaintiff's cause of action did not accrue until he retired and defendant refused to pay him benefits on the basis of his 1938 hire date. A cause of action for breach of contract accrues when the contract is breached. *See Hollin v. Libby, McNeill & Libby,* 253 Or 8, 13, 452 P2d 555 (1969). A breach of contract is nonperformance of a duty due under a contract. Restatement (Second) Contracts § 235(2) (1979). The claimed agreement was that defendant would credit plaintiff with continuous service from 1938 for the purpose of calculating his employe benefits. The question is, what performance on defendant's part was required under the contract? Merely crediting plaintiff with continuous service in the abstract by making an entry in the company's records that the pension would be based on the 1938 hire date and assuring him that, when he retired, payments would be calculated on that basis would not have constituted complete performance if defendant were not also ultimately to pay plaintiff his benefits on the basis of the 1938 hire date. Defendant was required actually to pay plaintiff his benefits to complete its performance, which was not due to begin until plaintiff retired and became eligible to receive payments. Therefore it did not breach the contract until April or May, 1982, when it first paid him pension benefits calculated on the basis of the 1966 rehire date. Plaintiff's action was timely.

Although not directly in point, *Davis v. Alabama Power Company,* 383 F Supp 880 (ND Ala 1974), *aff'd* 535 F2d 657 (5th Cir), *aff'd on other grounds* 542 F2d 650 (5th Cir 1976), *aff'd on other grounds* 431 US 581, 92 S Ct 2002, 52 L Ed 2d 595 (1977), supports our conclusion. The plaintiff, a World War II veteran who had temporarily left the defendant's employ to serve in the armed forces, brought an action to require the defendant, pursuant to the Military Selective Service Act, to consider the time he spent in the military as "accredited service" for the purpose of computing his pension benefits under the defendant's pension plan. He originally had worked for the defendant for seven years, then served in the military for approximately two and one-half years and then returned to work for the defendant until he retired in 1971. In 1967, the defendant had advised him that its pension plan did not afford accredited service for his time in the military. He

brought an action in 1972. One of the issues was whether his claim was barred by a six-year Statute of Limitations for contract actions. The defendant argued that the cause of action accrued on the plaintiff's return to work in 1945. The court rejected that argument:

"* * * This court is of the opinion that this contention by the defendant contains no merit.

"In the case of a pension plan, the beneficiary generally has no right of action until his rights have vested by the confluence of the stipulated time with the continued adherence to the conditions of the plan. A failure to assert it before it becomes vested does not start the statute running. * * *

"The court is of the opinion that no claim for relief arose before the plaintiff's retirement date. It is possible that an anticipatory breach occurred in 1967 when the defendant informed the plaintiff that he would not get credit in seniority computation under the pension plan for the time spent in military service. However, the law is settled that the plaintiff has the election to bring his claim for anticipatory breach at the time it occurs or he may elect to wait until time for performance. Plaintiff did not elect to declare an anticipatory breach in 1967; therefore, the statute of limitations did not begin to run prior to his retirement in 1971." 383 F Supp at 893. (Footnote omitted.)

The difference between *Davis* and this case is that the plaintiff's claim in *Davis* arose under a federal statute, but the claim here arises from an oral agreement. However, in both cases, the defendants could not perform until the plaintiffs became eligible to receive pension benefit payments, and neither plaintiff was required to bring an action until that time.

Defendant cites *Schmidt v. McKay*, 555 F2d 30 (2nd Cir 1977), in support of its argument that this action was untimely. That case is inapposite, because the defendant's obligations under the contract involved there could have been performed long before the plaintiff retired.

■ Defendant argues in its second assignment that, pursuant to the Statute of Frauds, ORS 41.580(1), the agreement is void as an oral agreement which by its terms is not to be performed within a year from its making. However, when one party to a contract has completely performed within one

year, the contract is not within that provision. *Kneeland v. Shroyer*, 214 Or 67, 328 P2d 753 (1958). Here, plaintiff completely performed his part of the agreement when he accepted defendant's job offer. Therefore, the agreement is not within the statute.

Citing *Page v. Kay Woolen Mill Co.*, 168 Or 434, 123 P2d 982 (1942), defendant argues in its third assignment that the trial court erred in denying its motion for directed verdict. In support of its motion, defendant argued that the agreement was either waived or amended by plaintiff's continuing to work after he learned between 1974 and 1976 that defendant intended to base his pension benefits on his 1966 rehire date. *Page* was an action brought by an employe for an accounting of the percentage of the defendant's profits for 1935 and 1936 allegedly owed him under his employment contract. When he was hired in 1926, the defendant had agreed to pay him a salary plus a bonus based on a percentage of its annual net profits. The court found that, when the plaintiff received his bonus in 1933, he was told that he would receive no future bonuses. Nevertheless, he continued to work for defendant until 1937. The court held that the plaintiff's contract had been changed by his conduct:

> "We agree with the statement made on the argument by counsel for the defendant that the crucial question is whether [defendant] in January 1934 notified the plaintiff that no bonus would be paid him thereafter. If [it] did so, it needs no citation of authority to support the proposition that plaintiff, by continuing to serve the defendant as its superintendent after such notice, assented to this change in his contract." 168 Or at 439.

*Page* is distinguishable from this case. The plaintiff there continued to work after his bonuses were due. He accepted the reduced compensation. The same cannot be said of plaintiff in this case. He did not continue to work for defendant after defendant's performance became due. As stated above, defendant's performance was due only after defendant became eligible to receive pension benefits. Furthermore, it is questionable whether plaintiff received adequate notice that defendant would not honor the agreement. The correspondence he received between 1974 and 1976 does not mention the oral agreement, and it could be interpreted as showing only that defendant had no record of the agreement.

Defendant's fourth and fifth assignments raise the issue of the authority of Platt and Webber to enter into the agreement on behalf of defendant. Defendant argues that the trial court erred in not directing a verdict against plaintiff, because there was insufficient evidence that either man had actual or apparent authority. The trial court instructed the jury under both theories. Reviewing the evidence in the light most favorable to plaintiff, *James v. Carnation Co.,* 278 Or 65, 67, 562 P2d 1192 (1977), we conclude that there was sufficient evidence.

We turn first to the issue of actual authority, which was explained in *Wiggins v. Barrett & Associates,* 295 Or 679, 686-87, 669 P2d 1132 (1983):

"Actual authority to act for another may be either express or implied. Express authority, of course, is just what it says. It is that authority which the principal confers upon the agent in express terms. The express authority given to an agent to do a certain thing carries with it the implied authority to do such other things as are reasonably necessary for carrying out the given task." (Citation omitted.)

Webber testified that he was responsible for overseeing the operation and expansion of the St. Helens mill, including the hiring of employes. He said that he had the authority to credit plaintiff with continuous service for the purposes of vacation benefits but not pension benefits, because the latter were controlled by defendant's headquarters. He admitted that employment procedures at the mill in 1966 were informal compared to other companies for which he had worked but stated that procedures for enrollment in pension plans were formalized. Platt testified that, as plant engineer, he supervised other employes but that he did not have authority to credit plaintiff with continuous service. He said that, in 1966, defendant was a fast-growing company and that mill managers, such as Webber, were autonomous in making decisions concerning the operation of the mill. He assumed that Webber had the authority to grant plaintiff his request because he was autonomous. He testified that, if Webber was ever required to notify defendant's headquarters about anything, it was a mere formality.

Two employes from defendant's personnel office also testified. The first said that mill level employes, such as Platt

and Webber, had no authority to make decisions concerning retirement benefits. She was not aware of any document stating who could authorize exceptions to the continuous service requirements, but she believed that such exceptions could only be made by senior level management. The second testified that there were only two ways to make exceptions to the pension plan: amend the plan or obtain approval from a senior executive at the corporate level. The only authority mill level supervisors had was to hire someone and record the hire date. Beyond that, company headquarters made decisions regarding pensions.

■. There was no evidence that either Platt or Webber had express actual authority. However, the jury could have found that Webber had implied actual authority. He had express actual authority to oversee the operation and expansion of the mill and to hire employes. There was evidence that he was autonomous in that respect. From that, the jury could find that he was authorized to do all things reasonably necessary to carry out his express authority, including granting plaintiff continuous service in order to convince him to take the job. *See Neppach v. Or. & Cal. R. R. Co.,* 46 Or 374, 80 P 482 (1905).

■ ■ There was also sufficient evidence of apparent authority as described by the Supreme Court:

> "* * * [A] principal may be held bound to a third person for an act of the agent completely outside the agent's implied (or express) authority if the principal has clothed the agent with apparent authority to act for the principal in that particular. In other words, the principal permits the agent to appear to have the authority to bind the principal. We have stated the elements necessary to establish apparent authority in *Jones v. Nunley,* 274 Or 591, 595, 547 P2d 616 (1976):
>
> " 'Apparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief.' "
> *Wiggins v. Barrett & Associates, supra,* 295 Or at 687-88.

Apparent authority may be created by placing the agent in a managerial position. *Filter v. City of Vernonia,* 64 Or App 559, 563, 669 P2d 350 (1983). The jury could find that, by placing Platt and Webber in positions of authority, defendant clothed

them with the appearance of authority to make the agreement and that plaintiff reasonably believed that they had such authority.

■ Defendant's sixth assignment is that the trial court erred in refusing to instruct the jury that neither Platt nor Webber had express authority, and its seventh assignment asserts error on the part of the court in instructing the jury under theories of both actual and apparent authority. Giving the latter instruction, patterned after the definitions of authority set forth in *Wiggins v. Barrett & Associates, supra,* was not error, because there was evidence to support both theories. If refusing the former instruction was error, it was not prejudicial, because the latter instruction fully and accurately explained the issue of authority to the jury.

■ Finally, defendant argues that there was not sufficient evidence to establish that there was a meeting of the minds between plaintiff and Webber. Before a valid contract can exist, there must be a meeting of the minds as to all its essential terms. *Phillips v. Johnson,* 266 Or 544, 555, 514 P2d 1337 (1973). Plaintiff and Webber did not have any face to face discussions concerning plaintiff's request for continuous service. Platt acted as an intermediary. However, plaintiff's theory was not that he had reached an agreement only with Webber, but rather that he had reached an agreement with defendant through its agents, Platt and Webber, and that the terms of that agreement were that plaintiff's hiring date of 1938 would be used for calculating all benefits to which he was entitled, including his pension. There was sufficient evidence to support that theory. Although plaintiff and Webber never directly communicated about plaintiff's request for continuous service, there is sufficient evidence that plaintiff's request and Webber's approval were communicated through Platt.

The judgment for plaintiff on his first count is affirmed.

Plaintiff alleged in the second count of his complaint that his employment with defendant was terminated by mutual agreement, that defendant owed him additional earned compensation in the form of pension benefits, which it had wilfully refused to pay him, and that he therefore was entitled to those benefits, plus penalties under ORS 652.150

and attorney fees under ORS 652.200(2).[1] The trial court directed a verdict for defendant on that count on the ground that pension benefits are not "wages" under those statutes. Plaintiff assigns error to that ruling. On appeal, he has abandoned his claim for statutory penalties. He argues only that he is entitled to attorney fees under ORS 652.200(2), because his action to recover his pension benefits was an "action for the collection of wages" under ORS 652.200(2).

The term "wages" in ORS 652.200(2) is not defined by statute. However, the Supreme Court and this court have broadly construed the term to mean any compensation for an employe's services. In *State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 432 P2d 512 (1967), the court held that a claim for unpaid vacation pay was a wage claim under ORS 652.330, which authorized the Commissioner of Labor to take assignments of "wage claims" and to sue employers on those claims. The court construed "wages" to mean "*all* earned compensation contracted to be paid by the employer for the employe's personal service regardless of the nature of such compensation." 248 Or at 136. (Emphasis in original.) The court found support for its decision in the policy behind the statute:

> "The policy of the statute is to aid an employe in the prompt collection of compensation due him and to discourage an employer from using a position of economic superiority as a lever to dissuade an employe from promptly collecting his agreed compensation. This policy is just as applicable to an unpaid vacation claim as to an unpaid hourly compensation

---

[1] ORS 652.150 provides:

"If an employer wilfully fails to pay any wages or compensation of any employe who is discharged or who quits his employment, as provided in ORS 652.140, then, as a penalty for such nonpayment, the wages or compensation of such employe shall continue from the due date thereof at the same rate until paid or until action therefor is commenced; provided, that in no case shall such wages or compensation continue for more than 30 days; and provided further, the employer may avoid liability for the penalty by showing his financial inability to pay the wages or compensation at the time they accrued."

ORS 652.200(2) provides:

"In any action for the collection of wages, if it is shown that the wages were not paid for a period of 48 hours, excluding Saturdays, Sundays and holidays, after the same became due and payable, the court shall upon entering judgment for the plaintiff, include in such judgment, in addition to the costs and disbursements otherwise prescribed by statute, a reasonable sum for attorney fees at trial and on appeal for prosecuting said action, unless it appears that the employe has wilfully violated the contract of employment."

claim. Vacation pay, in addition to being an inducement to accept employment and promote increased tenure, is intended to sustain the employe during the vacation period. The smaller the amount of the unpaid compensation the greater is the need for assistance in effecting collection. The policy of the statute is analogous to the policy underlying ORS 20.080, which allows the collection of attorneys fees in certain small tort claims." 248 Or at 138.

In *Hekker v. Sabre Construction Co.*, 265 Or 552, 510 P2d 347 (1973), the court held that commissions were "wages" within ORS 652.200(2). The court cited with approval a portion of the above quoted passage from *State ex rel Nilsen v. Ore. Motor Assn.* and stated:

"The attorney fee statute is based on similar policy considerations, and we believe its language should be construed in the same spirit. In common usage, 'wages' has both a narrow meaning, suggesting payment for stated, relatively brief, intervals of labor, and a broader meaning suggesting various forms of payment for services rendered. It is, we believe, most consistent with the policies underlying ORS 652.200(2) to give the word, as used in that statute, a broad construction commensurate with the statute's purposes.

"Courts have frequently construed 'wages' in remedial or protective legislation to include compensation in the form of commissions, and we are of the opinion that ORS 652.200(2) should be so construed. The trial court erred in holding that plaintiff was not entitled to recover attorney fees under the statute." 265 Or at 559-60. (Footnote omitted.)

In *Chvatal v. United States National Bank of Oregon*, 285 Or 11, 17, 589 P2d 726 (1979), the court accepted as settled under *State ex rel Nilsen v. Ore. Motor Ass'n, supra,* that severance benefits are wages within ORS 652.200(2). Finally, we held in *Wyss v. Inskeep,* 73 Or App 661, 671, n 12, 699 P2d 1161, *rev den* 300 Or 64 (1985), that an employe who successfully brings an action for an unpaid bonus is entitled to attorney fees under the statute.

The Seventh Circuit Court of Appeals held in *Affetto v. TRW, Inc.,* 691 F2d 357 (7th Cir 1982), that a suit to establish entitlement to pension benefits was a suit for "wages" under a statute providing for attorney fees in such suits. The court construed an Illinois statute providing for an award of attorney fees in a successful "suit for wages earned

and due and owing according to the terms of the employment
* * *." It discussed and cited with approval *Hekker* and *State
ex rel Nilsen.*

██. Pension benefits are deferred compensation for an
employe's service. The policy of aiding employes in the
prompt collection of their earned, but unpaid, compensation
and discouraging employers from using their superior eco-
nomic positions to dissuade employes from promptly collect-
ing their compensation is as strong in the case of pension
benefits as it is with ordinary wages, vacation pay, severance
benefits and bonuses. Pension benefits are as important to an
employe as those other forms of compensation. We therefore
hold that an action for the collection of unpaid pension
benefits is an "action for the collection of wages" for the
purposes of ORS 652.200(2).

Defendant argues that plaintiff's action was not one
for the collection of wages, because his pension benefits were
not due and payable on termination, but rather were to be paid
in monthly installments until his death. It cites ORS
652.140(1) and (2) in support of its argument. ORS 652.140
provides:

"(1)   Whenever an employer discharges an employe, or
where such employment is terminated by mutual agreement,
all wages earned and unpaid at the time of such discharge shall
become due and payable immediately * * *.

"(2)   When any such employe, not having a contract for a
definite period, shall quit his employment, all wages earned
and unpaid at the time of such quitting shall become due and
payable immediately if such employe has given not less than
48 hours' notice, excluding Saturdays, Sundays and holidays,
of his intention to quit his employment. If such notice is not
given, such wages shall be due and payable 48 hours, excluding
Saturdays, Sundays and holidays, after such employe has so
quit his employment."

██ Plaintiff does not base his claim for attorney fees on
that statute. He relies solely on ORS 652.200(2), which does
not require that the wages be due and payable upon termina-
tion. Rather, it requires only that the employe show "that the
wages were not paid for a period of 48 hours, excluding
Saturdays, Sundays and holidays, after the same became due
and payable." Plaintiff established that defendant's monthly

pension payments that he had received up until the trial were several hundreds of dollars less per month than they would have been had defendant credited him with continuous service from 1938. Under ORS 652.200(2), plaintiff is entitled to attorney fees for his attorney's effort in collecting those amounts not paid within 48 hours after they had become due and payable. We reverse and remand for determination of plaintiff's attorney fees in collecting those amounts.

Affirmed on appeal; reversed and remanded on cross-appeal for determination of attorney fees.