Argued and submitted January 4, affirmed August 7, 2002

Thomas C. MILLER,
*Respondent,*

*v.*

C. C. MEISEL CO., INC.,
an Oregon corporation,
*Appellant.*

C. C. MEISEL CO., INC.,
an Oregon corporation,
*Counterclaim
Plaintiff-Appellant,*

*v.*

Thomas C. MILLER,
*Counterclaim
Defendant-Respondent.*

9905-05439; A109804

51 P3d 650

149-a

Barbee B. Lyon argued the cause for appellant. With him on the briefs were William F. Martson, Jr., Jeanne M. Chamberlain, and Tonkon Torp LLP.

Jacob Tanzer argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiff is the former general manager of defendant, a rock crushing and quarry operating business. He brought this action against defendant after he retired from his employment with defendant claiming among other things, an entitlement to 20 percent of the value that he had "added" to defendant, as allegedly had been promised to him. Defendant denied the existence of such an agreement and brought other defenses against its enforcement, including the affirmative defense of excuse, based on plaintiff's own alleged material breaches of his duties to perform under the employment contract.[1] A jury found that such an agreement existed and awarded plaintiff $1.36 million as compensation under the agreement. Defendant appeals, and we affirm.

We recite only those facts pertinent to our analysis, in the light most favorable to the party in whose favor the jury returned a verdict. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 542, 17 P3d 473 (2001). Plaintiff began to work for defendant corporation in 1960. At that time, defendant was owned by parties not involved in this appeal. In 1974, Ray Town and two friends bought defendant for $1.2 million and kept plaintiff in place as its general manager. Plaintiff was also appointed to the board of directors. He was made responsible for managing the day-to-day operations of the business. Plaintiff asserts that in 1974, Town told him that "whatever I could make the business worth above what they had paid for it, 20 percent of that would be mine, that I was to run the business." Plaintiff testified that the phrase, "above what they had paid for it," meant the $1.2 million that had been paid by the purchasers to acquire defendant in 1974.

In 1976, defendant's board members had discussions about how to give plaintiff an interest in the company, including a "phantom stock" idea that was rejected. At that time, they made no further efforts to structure the method by which plaintiff would be compensated for the "added value." In 1981, there was a change in ownership, and Town lost control of defendant temporarily. In 1982, Town regained control

---

[1] Defendant also pleaded and recovered on several counterclaims.

of defendant and called plaintiff, telling him, "I ended up with [defendant], Partner." Plaintiff continued to work for defendant and, by all accounts, was a hard-working employee. He was paid a salary and often received bonuses, as did other talented and valued employees of defendant. Plaintiff asked Town repeatedly to record their agreement in writing as to the 20 percent payout, but Town said that they would work it out in the future. The company's accountant, Kopacek, was aware of the existence of a "20 percent agreement" in the three to four years before plaintiff's retirement.

By 1992, Town had transferred his ownership in the company to his children, but he maintained his role as president. Plaintiff asked Town to tell his children about their agreement, and Town called a board meeting in 1992 at which he explained the agreement with plaintiff and told the board members that the agreement was an obligation of the company. Plaintiff testified that Town said to his children that, "the deal was that whatever [plaintiff] could make the company worth, less the $1.2 million times 20 percent, would be what [plaintiff] would get when [he] either retired or the company were sold."

In 1993 and 1994, plaintiff received permission from defendant to build a house at Muhs quarry, on land owned by it. Defendant agreed to pay the costs of construction of the home and to allow plaintiff to live there rent-free. Plaintiff built a house there, charged the cost of construction to defendant, and moved into the Muhs quarry house in 1994. He sold his former house on 28th Street in McMinnville and, as part of the agreement with defendant, deposited $110,000 of the proceeds of the sale of the 28th Street house with defendant. Plaintiff testified that he believed he was entitled to live in the Muhs quarry house until both he and his wife died. Town testified that he believed that plaintiff's right to occupancy depended on his continued employment with defendant.

The record shows that, throughout the period of Town's ownership of defendant, both plaintiff and Town used corporate assets and labor for personal purposes.[2] For

_____

[2] Evidence of Town's own disregard for corporate formalities is documented in the record as part of plaintiff's defense against defendant's counterclaim for breach of fiduciary duty.

instance, plaintiff charged a country club bill to the corporation, bought some jewelry and gifts for his wife with company money, and took some company property to his home for personal use (a camcorder and telescope, among other things). At one point, plaintiff also used defendant's left-over rock in another business that he personally operated, and he charged the company for the labor involved in moving the rock from defendant's location to the site of the other business. He also charged defendant for some expenses that were arguably for defendant's benefit but that benefitted his own personal business as well. Finally, plaintiff authorized bonuses for other employees of defendant without the express consent of Town.[3] Defendant relies on this evidence to support its assertion that plaintiff materially breached his employment agreement with defendant and that defendant therefore should be excused from the performance of the agreement to pay the 20 percent of the added value.

Plaintiff notified Town of his intent to retire in May or June 1996. Plaintiff and Town talked about how to value plaintiff's percentage of added value, and they initially sought to have the corporate accountant perform a valuation of defendant. Plaintiff also solicited bids from interested parties to purchase defendant, and defendant received a bid for $8 million. The shareholders initially contemplated selling defendant to that bidder, but Town decided not to sell. Plaintiff then retired in February 1997, nine months after giving his notice.

After plaintiff's retirement, Town began the process of valuing defendant so as to calculate plaintiff's share. Town instructed his accountant to calculate what defendant's shareholders would have received if Town had accepted the purchase offer, taking into consideration the tax implications of such a sale. Plaintiff disagreed with Town's insistence on treating the tax consequences as part of the valuation of the company and, after further negotiations, the parties were unable to resolve their dispute about the amount of added value. Plaintiff then brought this action. His complaint

---

[3] There is no allegation that plaintiff ever gave himself an unauthorized bonus or otherwise directly took money from defendant.

includes alternative counts for breach of contract and a count for "unpaid compensation."[4] Defendant answered, denying that there was an enforceable agreement. It also asserted multiple affirmative defenses, including the defense of excuse of performance because of plaintiff's alleged material breaches.

At trial, the parties agreed to submit the breach of contract claim to the jury and to have the trial court decide, after the jury returned its verdict, whether any monies owed under the agreement constituted "wages," within the meaning of ORS chapter 652, in the event that the jury found for plaintiff on the contract claim. The jury found that the agreement existed and awarded plaintiff $1.36 million as 20 percent of the "added value" to defendant. In addition, the court awarded $110,000 to plaintiff, representing the proceeds from the sale of plaintiff's 28th Street home that plaintiff had deposited with defendant. It also awarded $50,000 to defendant on a claim for breach of fiduciary duty owed to it by plaintiff and $23,625 to defendant on a trespass claim, apparently based on evidence that plaintiff had refused to vacate the Muhs quarry house on defendant's land. The court entered the jury verdicts. The court then held, after a separate hearing, that the compensation owed under the agreement constituted "wages" within the meaning of ORS chapter 652, and it issued an order reflecting its ruling. Subsequently, it entered judgment in that amount "on plaintiff's First Claim for Relief, Counts I and II (Breach of Contract, Unpaid Compensation)." The judgment also awarded plaintiff $456,594 in attorney fees under ORS 656.200 on his unpaid compensation claim.

■ Defendant's first assignment of error asserts that the essential terms of the agreement—that 20 percent of the added value "would be mine"—are too indefinite to be enforced and that the trial court erred in denying its motion for a directed verdict on plaintiff's breach of contract claim on that ground. Defendant argues that the agreement is unenforceable because it does not provide for tax implications,

---

[4] Plaintiff's action also included an alternative claim in quasi-contract and a request for a declaration that plaintiff had a life estate in the Muhs quarry house.

that there are no terms for payment, and that "there was no agreement * * * for the trial court to enforce, only an obligation to negotiate further." It relies on *Ford v. Blinn*, 50 Or App 515, 519, 623 P2d 1110, *rev den* 290 Or 853 (1981), for the proposition that "uncertainty in the terms of payment is * * * a defect in an essential provision and renders a contract unenforceable." In response, plaintiff relies on *Delmar Crawford, Inc. v. Russell Oil Co, Inc.*, 106 Or App 524, 527-28, 808 P2d 1021 (1991). In *Delmar Crawford, Inc.*, we said that the "terms of payment are only necessary if the sale is other than for cash. If a contract does not specify payments terms or indicate that term payments are contemplated, it is implied that the sale is for cash." *Id.* (citation omitted).[5]

■ Whether the trial court erred in denying defendant's motion for a directed verdict presents a question of law. *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 576 P2d 1244 (1978). In *Van v. Fox*, 278 Or 439, 445-46, 564 P2d 695 (1977), the court explained:

" 'The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained.' (*Quoting* 11 Williston on Contracts 813, § 1424 (3d ed 1968)).

"*Accord* 5A Corbin on Contracts 279-83, § 1174 (1964):

" 'Courts should be ready to give those reasonable interpretations that ordinary businessmen are willing to give, seeking the aid of experts and giving heed to all the surrounding circumstances. * * * The fact that the parties omitted certain provisions that are commonly included may indicate an intention to be bound without them and the gaps may be provided for in the decree.'

"* * * * *

" '* * * Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact.'

---

[5] Both *Ford* and *Delmar Crawford, Inc.*, involved contracts for the sale of land, not personal performance contracts.

"*See also* Restatement of Contracts § 370 (1932).

"Essentially, then, the resulting standard becomes one of substantial fairness to both parties. Neither party to a contract should be required to perform additional, material terms to which he did not either explicitly or implicitly agree. On the other hand, however, neither party should be allowed to avoid his contractual duties merely because the language which was utilized to express the agreement is less specific and complete than that which a careful lawyer would ordinarily employ."

Also, as the Supreme Court acknowledged in *Van*,

" 'When a *contract has been partly performed* by the plaintiff, and the defendant has received and enjoys the benefits thereof, and the plaintiff would be virtually remediless unless the contract were enforced, the court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the defendant merely on the ground of the incompleteness or uncertainty of the agreement. Even if the agreement be incomplete, the court will then, in furtherance of justice and to prevent a most inequitable result, decree a performance of its terms as far as possible, although, perhaps, with compensation or allowance.' " *Van*, 278 Or at 451, *quoting* J. Pomeroy, *Specific Performance of Contracts* 378-79, § 145 (3d ed 1926) (emphasis in original).

We conclude that, under the above standards, the agreement between the parties was enforceable. Plaintiff worked for defendant from 1974 based on Town's promise that he would receive 20 percent of the added value to defendant when he retired. The promise contains sufficient clarity as to the critical provisions (the mutual obligations, the amount owed, and the timing of payment) to be enforceable. To deny plaintiff the benefit of that promise would be to deny him "substantial fairness" under the circumstances. The failure of the agreement to contain payment terms is not fatal because the parties' agreement implies that plaintiff would be paid the entire amount owed upon his retirement or upon the sale of the company. There are no agreed-upon terms in the agreement regarding tax consequences, either, but that omission does not vitiate the agreement. The bargain struck may have put defendant in a predicament about how to pay what was owed, but the law does not protect parties who

enter into unwise agreements that are otherwise enforceable. We hold that the trial court did not err in denying defendant's motion for a directed verdict because the agreement is definite enough to be enforceable.

■ We turn next to defendant's ninth assignment of error because deciding it is a predicate to defendant's other arguments about the unpaid compensation claim. In its ninth assignment of error, defendant argues that "the damages awarded to [plaintiff] do not constitute wages." Therefore, it follows, according to defendant, that the trial court erred when it awarded attorney fees to plaintiff under ORS chapter 652. In a hearing to the trial court on that issue after the verdicts were entered regarding the amount of compensatory damages, defendant argued that (1) "not every contract between employee and employer is or constitutes wages"; (2) when an employee receives wages and a bonus, it is presumed that the employee is fully compensated for his work through those means, and that other agreements are not part of "wages"; (3) plaintiff's claim was more in the nature of ownership shares in the company than in the nature of wages; and (4) the statutory scheme in ORS chapter 652 is directed only at relatively small, periodic payments of sums that are easily calculable. The court ruled against defendant, reasoning in part, that

"[w]hile the courts have referred to the importance of promoting small wage claims, they have not so limited ORS 652.200(2).

"* * * * *

"I find that [plaintiff's] claim was one for 'wages' under ORS 652.200(2)."

On appeal, defendant attempts to distinguish the case law interpreting broadly the term "wages" in ORS chapter 652 and argues that the amount of the compensation, the nature of the agreement, and the difficulties in calculating what was due under the agreement combined to put the agreement outside the reach of the statute. Plaintiff argues in response that, under ORS 652.210, "wages" are defined as "*all* compensation for performance of services by an employee for an employer whether paid by the employer or another person" and that the $1.36 million award is "compensation

for [plaintiff's] years performing services as [defendant's] general manager." (Emphasis added.) Plaintiff relies on the same cases that defendant attempts to distinguish regarding the scope of ORS chapter 652. *See, e.g., Chvatal v. United States National Bank of Oregon*, 285 Or 11, 17, 589 P2d 726 (1979) (holding that severance benefits are "wages"); *Hekker v. Sabre Constr. Co.*, 265 Or 552, 560, 510 P2d 347 (1973) (the term "wages" is to be given "a broad construction commensurate with the statute's purposes"); *Kantor v. Boise Cascade Corp.*, 75 Or App 698, 711, 708 P2d 356 (1985), *rev den* 300 Or 506 (holding that pension benefits are wages); *Wyss v. Inskeep*, 73 Or App 661, 671 n 12, 699 P2d 1161, *rev den* 300 Or 64 (1985) (holding that some kinds of bonuses constitute "wages").

■ As *Hekker* holds, the word "wages" is to be interpreted in the sense that " 'best harmonize[s it] with the context and * * * the policy and objectives of the legislation.' " *Hekker*, 265 Or at 559, *quoting State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 137, 432 P2d 512 (1967). The policy underlying an award for attorney fees under ORS 652.200 is

> "[t]o aid an employe in the prompt collection of compensation due him and to discourage an employer from using a position of economic superiority as a lever to dissuade an employe from promptly collecting his agreed compensation." *State ex rel Nilsen,* 248 Or at 138.

Defendant's promise to pay plaintiff 20 percent of the added value was a promise to pay additional compensation for plaintiff's managerial services in return for the benefit of his skills and his continuing to work for defendant until he retired. Plaintiff performed his part of the bargain and satisfied the condition precedent to the payment of the bonus. ORS 652.210(3); *Wyss*, 73 Or App at 667-68 & nn 5, 6. Consequently, in light of the policy of ORS 652.110 *et seq.*, we hold that plaintiff's claim for 20 percent of the value of the company as compensation for his efforts to increase the company's value constitutes a wage claim within the meaning of ORS 652.200. Therefore, the trial court did not err in awarding attorney fees under that statute.

■ Defendant also assigns error to the trial court's ruling "granting [plaintiff's] motion for a directed verdict

against [defendant's] affirmative defense of excuse." Its third assignment of error is related to the second assignment; it asserts that "the trial court erred in declining to give the jury * * * instruction concerning defendant's Fourth Affirmative Defense of excuse." In essence, defendant's arguments present the question of whether the trial court erred when it took from the jury's consideration the issue of plaintiff's alleged breaches of his employment contract as a defense to defendant's performance under the agreement. We address the assignments together, turning first to a procedural matter.

At trial, plaintiff moved to have defendant's defense of material breach struck in its entirety. In a more specific argument, he also told the trial court:

"[T]he Fourth Affirmative Defense, excuse * * * would not affect the wage claim, even if it does affect the contract claim. There is one little difference there that we should keep in mind.

"* * * * *

"* * * The existence of counterclaims is no defense to a wage claim[.]"[6]

The trial court granted plaintiff's motion in its entirety without distinguishing between the applicability of the defense to each count. It held:

"Even if believed as a matter of law, the conduct that's been testified to would not excuse performance of the obligations that a jury might find under the alleged 20% agreement, and I'm granting the motion to strike the Fourth Affirmative Defense."

After the jury returned its verdict, the trial court entered judgment for plaintiff on both the contract and the unpaid compensation claims in the amount of $1.36 million.[7]

---

[6] Later in the trial, plaintiff told the trial court that "a willful breach * * * is still not a defense[.] * * * It is not a defense to the wage claim." After the trial court ruled, the court acknowledged that it had ruled on the issue of the defense's applicability to the wage claim; it said, "[Plaintiff's misconduct] is not a question of an excuse for not paying [wages], but is it an excuse from the attorney fee?" In addition to the above statement, the trial court also indicated during discussions of the attorney fee issue that "[i]nability to pay wasn't a defense to your claim. The only defense would be the one we submitted to the jury by interrogatory on whether there was a willful violation."

[7] The judgment provides, in part:

Even if we assume, as defendant asserts, that there was sufficient evidence for the affirmative defense of plaintiff's material breaches to go to the jury, the question remains whether the alleged errors designated in the second and third assignments of error operate to vitiate the judgment on the count for unpaid compensation or on the count that we have now determined to constitute a statutory wage claim. Thus, the inquiry properly turns on the provisions of ORS chapter 652, specifically, whether an employee's own misconduct can constitute a defense to the otherwise absolute obligation imposed by ORS 652.140 to pay all sums "due and payable not later than the end of the first business day after the discharge or termination."[8] Defendant argues that "these statutes do not purport to take away an employer's right to assert a counterclaim, let alone a defense [in a wage claim]." For the sake of clarity, we point out that defendant did in fact bring a counterclaim based on plaintiff's alleged misappropriations of defendant's property, and it prevailed, in part, on that counterclaim. The judgment reflecting the jury's decision on defendant's counterclaim is not at issue in these assignments of error. Defendant's primary argument is that its defense—excuse of performance based on plaintiff's material breach—is available to defeat plaintiff's claim for wages as a matter of law. It appears to contend that, if an employer desires to dispute its liability for wages, it can refuse to pay the wages when due and then can raise the employee's own malfeasance or nonfeasance as a defense at trial.

■ Defendant's premise underlying its second and third assignments of error is incorrect as a matter of law. In essence, defendant raises the same argument that we rejected in *Schulstad v. Hudson Oil Company, Inc.*, 55 Or App 323, 637 P2d 1334 (1981), *rev den* 292 Or 825 (1982). In

"WHEREFORE, IT IS HEREBY DECREED AND ADJUDGED:

"1. Judgment is entered in favor of plaintiff and against defendant in the sum of $1,360,000 on plaintiff's First Claim for Relief, Counts I and II (Breach of Contract; Unpaid Compensation)[.]"

[8] ORS 652.140 provides, in part:

"Whenever an employer discharges an employee or where such employment is terminated by mutual agreement, all wages earned and unpaid at the time of such discharge or termination shall become due and payable not later than the end of the first business day after the discharge or termination."

*Schulstad,* an employee worked for the employer for approximately one month and, during the course of that employment, failed to account properly for cash that was in his control as manager of several service stations. When the employee was terminated, he was owed $850 in wages. However, $2,397 of employer's money was missing, for which the employee was accountable. The employer argued that it owed no wages to the employee because the employee had not performed his job adequately. It "urge[d] us to permit an employer to withhold wages for any work the employer has determined to be inadequately performed." *Schulstad,* 55 Or App at 326. We held:

> "If followed, this interpretation would defeat the central purpose of the wage collection statutes. As recognized by the Supreme Court, that purpose is the protection of employes:
>
>> " 'The policy of the statute is to aid an employe in the prompt collection of compensation due him and to discourage an employer from using a position of economic superiority as a lever to dissuade an employe from promptly collecting his agreed compensation.' *State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 138, 432 P2d 512 (1967).
>
> "There might seldom be prompt payment of termination wages if an employer, on some basis besides time worked, was allowed to decide that the wages were not earned. We do not suggest that an employer may not condition the payment of wages on an event other than time worked as part of the employment contract. *See Walker v. American Optical Corp.,* 265 Or 327, 509 P2d 439 (1973). However, the employment contract entered into between plaintiff and defendant here does not contain a condition for payment of wages." *Schulstad,* 53 Or App at 326.

Our reasoning in *Schulstad* defeats defendant's argument that plaintiff's breaches of his employment duties constitute a defense to defendant's obligation to pay the wages owed to plaintiff at the time he terminated his employment. Under ORS chapter 652, "self-help" is not available to an employer who seeks to offset wages that it owes to an employee. Defendant's remedy for any alleged misconduct by plaintiff was through a separate action for damages. *See also*

*Emery v. Portland Typewriter and Office Machine*, 86 Or App 635, 638, 740 P2d 218 (1987) (an employer's failure to pay wages was a willful violation of the Wage Claim Act when the employer attempted to offset the amount of wages due by the value of some office machinery that the employee had retained after termination). It follows that, even if the trial court erred as defendant claims under the second and third assignments of error, those errors are harmless in light of the validity of the existing judgment for unpaid wages.

■ Defendant's only additional argument challenging the unpaid compensation claim judgment is that the wages were not capable of calculation as of the time that the statute would have required them to become due and payable and thus were not "payable." *See* ORS 652.140 (requiring the payment of wages in this situation by the end of the first business day following the termination). Defendant argues that plaintiff himself would have had to complete the year-end financial statements before defendant's value could be accurately assessed and that plaintiff's failure to accomplish those tasks made his wages not yet "due and payable." Plaintiff asserts that they were due and payable, at the latest, as of the time that he filed his complaint in this case.

In *Crofoot v. Columbia-Willamette Air Poll. Auth.*, 31 Or App 903, 571 P2d 1266 (1977), we dealt with a similar situation. In that case, the employee told the employer at the time of termination that he was seeking another position to which his accrued employment benefits could transfer and that he would waive his right to immediate payment of his wages in order to preserve his ability to transfer his benefits. After seeking such a position and failing to obtain it, the employee then told the employer seven months later that he could not find such a position and demanded immediate payment of his severance wages. The employer did not make the payment. We held that the employer was liable for 30 days of penalty wages under ORS 652.150 because the wages had become "due and payable" upon the employee's subsequent demand. *Crofoot*, 31 Or App at 911.

■ Here, plaintiff gave defendant eight or nine months of notice of his pending retirement. That time period afforded

defendant ample time to calculate the sum due. Before plaintiff retired, he solicited a bid from an interested purchaser, which was some indication of fair market value. After plaintiff left defendant's employ, he had no further obligation to prepare year-end financial statements, and defendant's own failure to obtain a valuation of the company through other means does not excuse its obligation to calculate and pay the wages then due. Our opinion in *Wales v. Walt Stallcup Enterprises*, 167 Or App 212, 216, 2 P3d 944, *rev den* 330 Or 553 (2000), makes clear that "it is the employer's burden to pay final wages" even in the absence of a demand by the employee within the time period provided. Even if plaintiff agreed to postpone the payment of his wage compensation for a certain period of time while the parties negotiated, the wages became payable upon demand when the negotiations failed. Defendant's failure to pay at that time subjects him to the recourse provided in ORS chapter 652.

■ We turn next to defendant's fourth assignment of error. Defendant argues that the jury rendered inconsistent special verdicts by finding, on the one hand, that plaintiff breached his fiduciary duty to defendant and, on the other hand, that he did not wilfully breach his employment contract with defendant. Before the jury was discharged, defendant asked that the jury be further instructed and required to deliberate again in light of the purported inconsistency of the verdicts, but the trial court refused. Defendant asserts on appeal that the jury's verdict in favor of defendant on its breach of fiduciary duty counterclaim and its verdict in favor of plaintiff for attorney fees on the unpaid compensation claim are inconsistent, that the judgments reflecting those verdicts should be reversed, and that those issues should be remanded for a new trial.[9]

■ In response to the question, "Did [plaintiff] willfully breach his contract of employment?" on the verdict form, the jury said "no." It also returned a verdict for defendant on its breach of fiduciary duty claim. Defendant objected to the verdicts, arguing that the above verdicts were inconsistent. The

---

[9] In our view, defendant's attack does not implicate the judgment for unpaid compensation.

court asked defendant's counsel, "Assuming you are correct, what do you want me to do?" Defense counsel replied:

"It seems to me, Your Honor, that if they have found a breach of fiduciary duty, which duty arises because of this employment, they must have found, or I think they should be instructed that a breach of fiduciary duty constitutes a willful breach of employment contract."

The court responded, "What factual questions do you want me to submit to the jury at this time? If you are just asking for me to set aside part of the verdict, I don't need to have the jury waiting in the jury room to consider that." Upon further discussion, the court then ruled:

"I'm not going to instruct them they have to return a different form of verdict. If I become persuaded your legal position is correct, I can do that after they are discharged. I don't need to have them wait and put their pencil to it. I don't see any further factual inquiry you are suggesting we make to the jury.

"* * * * *

"I think you have a p[osition] on the law as I've instructed them, and if they found a breach of fiduciary duty as I instructed them that it was, your position is that as a matter of law that constitutes a willful breach of the employment contract. That seems to me to be just a legal question[.]"

We begin our analysis with a general principle. If there is any way to harmonize the verdicts, in accordance with the instructions that the jury was given, then the verdicts are not inconsistent as a matter of law. *State v. Mendez*, 308 Or 9, 774 P2d 1082 (1989). Here, the verdicts can be reconciled under the instructions given. As to the breach of fiduciary duty claim, the jury was instructed that a breach of fiduciary duty occurred if plaintiff (a) failed to act in good faith; or (b) failed to act in a manner that he reasonably believed to be in the best interests of defendant. The jury was specifically told that the only acts of plaintiff that it could consider in determining whether a breach of fiduciary duty occurred were plaintiff's use of defendant's rock and other equipment to benefit himself personally and his use of defendant's money to pay for goods and services for himself and his

family. The jury was also told that "defendant has alleged that plaintiff wilfully violated his employment agreement by committing certain acts, which are listed below, which taken together constitute a willful breach by plaintiff of his employment agreement." According to the instructions, the alleged breaches were plaintiff's use of defendant's rock and other materials for personal benefit, the use of defendant's money to buy items for himself and his family, the making of unauthorized bonus payments to other employees, and the lending of assistance to defendant's competitors. Although the jury was not told about the legal consequence of a finding of a willful breach, the trial court and the parties intended that the finding would guide the court on the issue of plaintiff's entitlement to attorney fees on the wage claim. *See* ORS 652.200 (an employee's willful breach is a defense to the payment of attorneys fees).

During its deliberations, the jury sent out a written inquiry regarding the meaning of the word "willful" in the jury instruction on defendant's allegation that plaintiff had willfully breached his employment agreement. The parties agreed that the court should tell the jury that the word "willful" meant "intentionally and knowingly." Ultimately, the jury returned verdicts finding that plaintiff had breached his fiduciary duty owed to defendant but had not willfully breached his employment agreement with defendant. Under the court's instructions, the jury's affirmative verdict on the breach of fiduciary duty claim means that it either found plaintiff liable for using defendant's rock and equipment for personal use or of using defendant's money to pay for personal goods and services, or both. At the same time, the jury could have found that plaintiff did not willfully breach his employment agreement, because his commission of any of the alleged acts of breach was not done "knowingly and intentionally." In other words, the jury may have believed that plaintiff thought he was authorized to use defendant's rock or equipment or money for personal use, when he in fact was not, but that his actions were not "willful" in the sense that he *knowingly* or *intentionally* violated his employment agreement with defendant in those particulars. The evidence offered by plaintiff supports such a finding; it would have permitted the jury to find that the corporate culture encouraged

by Town allowed plaintiff to reasonably believe that he could use defendant's property for personal use.[10] Under the instructions to which defendant agreed, the verdicts are not inconsistent.

In defendant's fifth assignment of error, it asserts that "[t]he trial court erred in withdrawing from the jury a part of [defendant's] counterclaim for breach of fiduciary duty." As part of its counterclaim for breach of fiduciary duty, defendant offered evidence that plaintiff paid bonuses to certain employees when he knew that Town had personally reserved the right to establish salaries and approve bonuses. Plaintiff moved to strike that part of the breach of fiduciary duty claim. In his argument to trial court, plaintiff's counsel acknowledged that such evidence would be relevant to his wage claim. However, plaintiff's counsel argued below and argues on appeal that the heart of a fiduciary duty is to put the corporation's best interests above one's own interests and that, because there is no evidence in the record showing that plaintiff had the intent to benefit personally by giving bonuses to other employees, plaintiff's conduct does not constitute a breach of fiduciary duty as a matter of law. Defendant responds that no legal requirement exists that the agent must be acting for personal gain in order to demonstrate a breach of fiduciary duty; all that is required is a showing of conduct beyond the scope of the fiduciary's authority.

Here, there is no evidence that plaintiff intended self-dealing or, in fact, engaged in self-dealing by awarding bonuses to dedicated employees. Defendant's evidence, viewed in the light most favorable to defendant on this issue, consists of the fact that plaintiff paid the bonuses and Town's

---

[10] In contrast to Town's testimony at trial that he "would have terminated [plaintiff] immediately" if he had known of several misuses of company property for personal use, plaintiff testified that Town told him on one occasion that "any good manager could 'lose' 20 yards of concrete," that plaintiff followed Town's example as to having defendant pay for insurance for personally owned cars, and that Town told him, "I only have two criticisms of your management style, Tom. Number one, you don't put enough on your expense account. Number two, you don't take enough time off. You work too many hours." Town acknowledged having made such a statement. There is also testimony establishing that, as to some purchases of personal items, including the purchase of gifts for plaintiff's wife using defendant's money, plaintiff routinely paid defendant back, using company money temporarily and only to keep his expenditure a surprise from the recipient of the gift.

testimony that he did not authorize the bonuses and did not know that they had occurred. Defendant produced no evidence showing that plaintiff ever awarded himself a bonus without authorization or that he personally gained financially or in any other manner from the bonuses awarded to other employees. The question, therefore, is whether in the absence of evidence of self-dealing, defendant's evidence is sufficient to establish a *prima facie* claim for the breach of a fiduciary duty.

 The general rule is that at the "the heart of a corporate fiduciary's duty is an attitude * * * of seeking the beneficiary's interests rather than the personal interests of the fiduciary." *Chiles v. Robertson*, 94 Or App 604, 619, 767 P2d 903, *mod on recons* 96 Or App 650, *rev den* 308 Or 592 (1989). As the court said in *Lindland v. United Business Investments, Inc.*, 298 Or 318, 324, 693 P2d 20 (1984),

> "[I]n an action for breach of the fiduciary duty of loyalty, the principal need only bear the burden of proving that *the agent acted on the agent's own behalf* in a transaction connected with the agency. This alone establishes the breach of duty: conflict of interest or self-dealing is the breach of duty."[11] (Emphasis added.)

Also, the *Restatement (Second) of Agency* defines the duties of a fiduciary in the following manner:

> "[A] fiduciary [is] a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Restatement (Second) of Agency* § 13 cmt (a) 1958.

It also provides:

> "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Restatement (Second) of Agency* at § 387.

Defendant cites two other cases, *Wulf v. Mackey*, 135 Or App 655, 899 P2d 755, *rev den* 322 Or 168 (1995), and

---

[11] In *Lindland*, the court also said, "Breach of the duty of loyalty is established by proof that the agent had a conflict of interest or was self-dealing." *Id.* at 327.

*Jarrett v. United States National Bank*, 81 Or App 242, 725 P2d 584 (1986), *rev den* 302 Or 476 (1987) in support of its assertion that it need not prove an intent to benefit personally in order to prove a breach of fiduciary duty. Neither *Jarrett* nor *Wulf*, however, supports defendant's assertion. In *Wulf*, the issue was whether there had to be evidence of actual personal gain or only evidence of an intent to personally gain from the misconduct. We commented:

"Although the breaches of fiduciary duty in [other named cases] produced pecuniary gains, those cases do not hold that such gain is a prerequisite to the maintenance of a direct action. Moreover, to imply such a requirement would produce anomalous results, *i.e.*, defendants who were so bungling in their attempts to freeze out minority shareholders that they did not actually profit from such efforts, would be immune from direct actions, regardless of the harm they caused minority shareholders." *Wulf*, 135 Or App at 661.

In *Jarrett*, the court held a trustee liable for the breach of a fiduciary duty based on particular contractual obligations and statutory duties applicable to trustees. We did not decide whether a plaintiff must prove that the defendant intended to benefit personally in order to establish a claim for breach of a fiduciary duty under the common law.

Because in this context the concept of a breach of fiduciary duty necessarily involves "self-dealing," or the agent acting for his or her own benefit rather than for the principal's benefit, we conclude that the trial court did not err on this record in taking from the jury the allegation that plaintiff had breached his fiduciary duty to defendant by making unauthorized bonuses to other employees. It could be that plaintiff exceeded the scope of his authority by paying the bonuses, but the only evidence is that he acted to benefit defendant. We are mindful that an agent may benefit in ways other than financially by paying unauthorized bonuses, but defendant does not make that kind of argument here. Rather, its argument is that such evidence is unnecessary in this case. We disagree. We do not perceive how, on the facts of this case, defendant could prove the necessary element of self-dealing in its claim for breach of a fiduciary duty without

some evidence that plaintiff intended by his action to benefit personally.[12]

■ In its sixth assignment of error, defendant argues that the trial court erred in granting a directed verdict on defendant's counterclaim for slander of title. In his complaint, plaintiff claimed that he had a life estate in the house that he had built on defendant's land. After filing his complaint, plaintiff filed a "Notice of Pendency of an Action" in the deed records of Yamhill County. The Notice, signed by plaintiff's attorney, was filed pursuant to ORS 93.740.[13] The notice states in its entirety:

> "Pursuant to ORS 93.740, the undersigned states that plaintiff Thomas C. Miller has filed in the Circuit Court of the State of Oregon for Yamhill County a civil action against defendant CCM Co., Inc., an Oregon corporation, asserting a claim to a life estate for the lives of himself and Donna Miller, his wife, in certain real property within Yamhill County, Oregon, described as follows: parcel 2 of Partition 94-18."

Defendant then brought a counterclaim in this action for "slander of title," based on plaintiff's notice filed in the deed records. Defendant's counterclaim alleges, in relevant part:

> "Plaintiff has uttered and publicized slanderous words against defendant in the Notice of Pendency of an Action dated October 31, 1997. This Notice stated falsely that

---

[12] This assignment of error raises issues related to those in the fourth assignment of error, namely, what is required to constitute a breach of fiduciary duty claim. The trial court's instruction on the elements of breach of fiduciary duty (that a breach occurs when an agent fails to act in good faith, or with a reasonable belief that he is acting for the principal's best interest) should not be understood to conflict with our holding in this assignment, which is that evidence of "self-dealing" is required. Each of the allegations presented to the jury under the breach of fiduciary duty claim involved alleged self-dealing.

[13] ORS 93.740 provides, in part, that:

"In all suits in which the title to or any interest in or lien upon real property is involved, affected or brought in question, any party thereto at the commencement of the suit, or at any time during the pendency thereof, may have recorded by the county clerk or other recorder of deeds of every county in which any part of the premises lies a notice of the pendency of the action containing the names of the parties, *the object of the suit,* and the description of the real property in the county involved, affected, or brought in question, signed by the party or the attorney of the party." (Emphasis added.)

plaintiff has a life estate in defendant's property and house
* * *. Plaintiff's claims were stated with malice."

The elements of a slander of title claim are: (1) a published statement that disparages a person's title; (2) that is false; (3) that is made with malice; and (4) special damages. *Cawrse v. Signal Oil Co.*, 164 Or 66, 670, 103 P2d 729 (1940). At trial, plaintiff moved for a directed verdict against the counterclaim, arguing to the trial court that (1) the assertions in the complaint itself were privileged; (2) that the notice said merely that a lawsuit had been filed "asserting a claim to a life estate"; and (3) that defendant therefore had not established that the notice contained a false statement as required by the elements of the tort.

In response to plaintiff's motion, defendant's trial counsel first agreed that the allegations in plaintiff's complaint were privileged and that none of the exceptions to the privilege applied to the assertions in the complaint.[14] He then told the court, "[T]his is the first time I've ever seen such a document entitled 'Notice of Pendency' that is filed in the deed records[.]" Plaintiff's counsel explained that the name for a *lis pendens* notice had been changed to "Notice of Pending Action," but that nothing else about the statutory framework had changed. Defendant's counsel then stated,

> "My point is that he didn't have the right under the statute to file *lis pendens*.[15] If he filed *lis pendens*, again, he'd have statutory—assuming its filed in good faith and all that—he'd have statutory immunity, but he didn't. * * * He instead prepared another document that effectively, I think our proof is, effectively stopped our ability to deal with this property. * * * And the jury will decide whether or not that statement, meaning the claim of the life estate, was true or

---

[14] *See, e.g., Pitts v. King et al.*, 141 Or 23, 15 P2d 379 (1932) (defamatory words in a pleading are privileged if they are applicable, pertinent and relevant to the issues in the case); *Honeyman v. Clostermann*, 90 Or App 615, 753 P2d 1384, *rev den* 306 Or 527 (1988), *overruled on other grounds by Baugh v. Bryant Limited Partnerships*, 104 Or App 665, 803 P2d 742 (1990), *reversed* 312 Or 635, 825 P2d 1383 (1992) (assertion of a claim to disputed property, made in a complaint in a civil action, was absolutely privileged).

[15] A notice of *lis pendens* is defined as "a notice filed on public records for the purpose of warning all persons that the title to certain property is in litigation, and that they are in danger of being bound by an adverse judgment." *Black's Law Dictionary*, 932 (rev 6th ed 1990).

not. In other words, it's a bit circular, Your Honor, but in the sense that the jury will have to answer the question first whether or not there was a life estate. If there wasn't a life estate, then they have slandered our title and we are entitled to damages."

Defense counsel continued:

"I don't claim to be the world's greatest real estate lawyer, Your Honor, but I meant when I said to the court I've never seen a document like this before. It's either *lis pendens* or it's the lawsuit itself that serves."

After hearing arguments by the parties, including plaintiff's response that its Notice of Pendency of an Action was the statutory equivalent of a *lis pendens* filing, the trial court directed a verdict for plaintiff on defendant's counterclaim. ORCP 60. The court reasoned that, as a matter of law, the notice merely recited the true fact that a lawsuit claiming a life estate in the subject property was pending.

■ Defendant argues on appeal that "it was the falseness of the complaint's contents, republished in the deed records, that constitutes slander of title." Defendant asserts that the language in the notice "had the practical effect of incorporating by reference the contents of the complaint" and "republishing" them as false statements defaming defendant's fee title. Defendant also contends on appeal that we should determine the falseness and maliciousness of plaintiff's assertions by asking whether plaintiff "file[d] such a notice without a good faith belief in his claim to the property." In support of its position, it cites *Montecalvo v. Mandarelli*, 682 A2d 918, 924 (S Ct R I 1996), for the proposition that, "if a party files such a notice without a good faith belief in his claim to the property, then he utters a statement knowing it is false." According to defendant, the jury could infer a lack of good faith by plaintiff in filing the notice based on Town's testimony that he told plaintiff that his right to live in the house ceased when plaintiff's employment with defendant terminated. Defendant concludes that, because there was an issue of fact about whether plaintiff had a good faith belief that he had a life estate in the house, it was error to direct a verdict in plaintiff's favor on defendant's counterclaim.

■ "Appellate courts are limited in their scope of review. Generally, on appeal the case, criminal or civil, should be heard on the same theory upon which it was presented in the court below." *State v. Hickmann*, 273 Or 358, 360, 540 P2d 1406 (1975). Defendant's arguments on appeal are fundamentally different from the arguments that it made to the trial court. In its argument in opposition to plaintiff's motion before the trial court, defendant acknowledged that plaintiff's allegations made in his complaint were privileged. It also acknowledged that, if plaintiff had filed a *lis pendens* notice, "he'd have statutory—assuming it's filed in good faith and all that, he'd have statutory immunity[.]" However, defendant's trial counsel argued that the privilege did not extend to the filing of plaintiff's "Notice of Pendency of an Action," which he apparently believed was not a notice authorized by ORS 93.740. In defendant's view as asserted below, the filing of such a document, unauthorized by ORS 93.740, was slanderous to defendant's title *per se*, assuming that the jury found that plaintiff was not actually entitled to a life estate.

On appeal, defendant relies on the theory for the first time that the allegations of the complaint were republished in the notice because of the reference in the notice to the filing of the lawsuit. The issue of whether the notice contained false allegations of fact is different from the issue of whether the notice republished false allegations made in the complaint by its reference to the complaint. Moreover, defendant's response to the motion for a directed verdict was to challenge the sufficiency of the notice under ORS 93.740 because, in its view, the notice did not constitute a *lis pendens* notice. Defendant conceded to the trial court that a notice made under ORS 93.740 was privileged if made in good faith, but it offered no argument to the trial court that plaintiff's notice was not filed in good faith. In contrast to the issues raised by those arguments, defendant asserts on appeal, in substance, that the trial court erred in directing a verdict because the jury could have reasonably inferred from Town's testimony that plaintiff's notice was not filed in good faith.

■ ORAP 5.45(4)(a) provides, in part:

> "Each assignment of error shall demonstrate that the question or issue presented by the assignment of error timely and properly was raised and preserved in the lower court."

One of the policies underlying ORAP 5.45's rule of preservation is to ensure that trial courts have the opportunity to rule on a particular question or issue, thereby potentially obviating the necessity of an appeal and the accompanying use of judicial resources. *J. Arlie Bryant, Inc. v. Columbia River Gorge Comm.,* 132 Or App 565, 568, 889 P2d 383, *rev den* 321 Or 47 (1995). Defendant's argument on appeal turns at least in part, on whether the allegations in plaintiff's complaint were "republished" in the notice, when plaintiff allegedly knew that Town had told him that he did not have a life estate. That argument and the issue it raises were not presented to the trial court. Rather, the focus of defendant's argument to the trial court was its belief that plaintiff's notice was "another document" other than a *lis pendens* filing that "effectively stopped our ability to deal with this property." Moreover, defendant told the trial court that a jury verdict against plaintiff on the claim for a life estate would automatically result in a verdict for defendant on the slander of title claim. That argument was manifestly incorrect because an adverse jury decision on plaintiff's claim would not, as a matter of law, establish that plaintiff lacked good faith when he directed his attorney to file the notice. We decline to review those issues on appeal that are qualitatively different from the issues raised below. *See, e.g., Veselik v. SAIF Corp.,* 177 Or App 280, 288-89, 33 P3d 1007 (2001), *rev den* 334 Or 121 (2002).

We turn to the issues regarding defendant's slander of title counterclaim that defendant did preserve. First, we agree with the trial court that the notice does not contain a false statement of fact. Rather, it accurately recites the fact of the filing of the lawsuit. Second, plaintiff's notice constitutes a *lis pendens* notice as contemplated by ORS 93.740. That statute, referred to as the *lis pendens* statute, *see Hoyt v. American Traders, Inc.,* 301 Or 599, 604-05, 725 P2d 336 (1986), was amended in 1987[16] to provide that the caption on the form of notice filed under the statute should be entitled

---

[16] Or Laws 1987, ch 586, § 24.

"Notice of Pendency of an Action." The amendment to the statute did not change the fundamental nature of a notice filed under it, and plaintiff's notice complies with the requirements of ORS 93.740. We hold that the court did not err in directing a verdict on defendant's counterclaim for slander of title under the circumstances.[17]

██ In defendant's seventh assignment of error, it argues that "[t]he trial court erred in denying [defendant's] equitable counterclaim for an accounting." Defendant asked the trial court to order an accounting after defendant began to unearth plaintiff's alleged misconduct in connection with his accounting and keeping of defendant's books. The items it sought to discover were expenditures like the $100 baskets of food given to charity by plaintiff on defendant's behalf and plaintiff's personal use of the company's camcorder and telescope. Plaintiff argues that defendant already has access to all of the relevant information because "all records of transactions are in the possession of [defendant]." The court denied defendant's request.

██ In our view, the controlling factor as to whether we should order an accounting is found in the following words of the Supreme Court:

> "A court of equity may also take jurisdiction in a case where an accounting is sought, provided it satisfactorily appears that the account is so complex that justice cannot be done without resort to the superior equipment of the equity court." *Flaherty v. Bookhultz*, 207 Or 462, 467, 291 P2d 221 (1956).

Based on the record before us, we agree with the trial court that discovery has already occurred on the more important issues framed by the parties. As to the remainder of the discovery requests, nothing in the pleadings or the record demonstrates to us that any remaining matters are "so complex that justice cannot be done" without the court's further intervention. We conclude that the court correctly denied defendant's claim for an accounting.

---

[17] We do not decide to what extent, if any, a notice filed under ORS 93.740 is, in fact, privileged for purposes of a slander of title action, in light of the fact that defendant did not argue to the trial court that the notice "republished" the contents of the allegations of the complaint in bad faith.

■ In defendant's eighth assignment of error, it contends that "the trial court erred in entering judgment that contradicted the jury verdict." Specifically, it argues that the court erroneously entered the portion of the judgment that awards $110,000 in supplemental relief to plaintiff, when the jury's answer to a question on the verdict form indicates that it had already added that amount to its award of $1.36 million.

The $110,000 judgment is based on the following facts. When plaintiff requested and received Town's permission to build the Muhs quarry house for himself on defendant's property, he sold his former house and received cash from the buyer (the proceeds of the house on 28th Street). Defendant took $110,000 of the proceeds of the 28th Street house as a "deposit" and held it in its accounts while plaintiff worked for defendant. The parties had an understanding that plaintiff would not receive any interest on the $110,000 deposited with defendant but that he would get it back if he ever vacated the Muhs quarry house. Those facts were before the jury.

Also, the jury heard evidence about a purported modification of the "added value" agreement, which defendant alleged had occurred after plaintiff's retirement. Defendant presented evidence attempting to show that plaintiff had agreed to take $900,000 in settlement instead of the 20 percent of the added value of defendant. According to defendant, the $900,000 was to be made up of the conveyance of fee title to Muhs quarry house, valued at approximately $638,000, and approximately $200,000 in cash. Defendant's theory was presented to the jury as a defense to his obligation to pay 20 percent of defendant's value.

The verdicts returned by the jury provide, in relevant part:

"On [plaintiff's] claim for breach of contract, we find

"<u>X</u> for [plaintiff] in the amount of $ 1,360,000 damages;
or

"__ for [defendant].

"If you find for [plaintiff], does the jury award include the value of the house?

"<u>X</u> Yes

"___No

"* * * * *

"On [plaintiff]'s second claim for a life estate in a house, we find

"___[plaintiff] is entitled to a life estate; or

"___[plaintiff] is not entitled to a life estate. * * *

"On [defendant]'s counterclaim for trespass, we find

"<u>X</u> for [defendant] in the amount of $23,625 damages; or

"___for [plaintiff]."

The verdict form does not contain the jury's answer to the question regarding whether plaintiff is entitled to a life estate in the Muhs quarry house. However, the fact that it found plaintiff liable for damages for trespass shows that it did not believe that plaintiff had a life estate in that house.

After the verdict was returned and the jury was discharged, defendant argued against entry of the $110,000 award for plaintiff, asserting that "whatever weight the jury gave to the fact that the plaintiff had deposited with the company, $110,000 was taken into consideration in th[e $1.36 million]." The trial court rejected defendant's challenge to the entry of judgment for plaintiff of $110,000, ruling:

"It certainly wasn't in my contemplation that there was any question about the return of the $110,000 if the defendant prevailed on the life estate question in the home. It was presented to the jury under the assumption that if there was no life estate, the plaintiff got the $110,000 back without interest. It was argued that way to the jury. The verdict form implied that to the jury. My instructions implied that to the jury. If there had been any suggestion to the contrary, I would have simply ruled that as a matter of law if you find there's no life estate, then the plaintiff is entitled to the return of $110,000 deposited with the defendant. So on the law, I'm going to rule that the plaintiff is entitled to $110,000."

Defendant argues on appeal:

"The jury found that [plaintiff] did not have a life estate in the house, for they awarded damages to [defendant] for trespass. At the same time, the jury declared that its award of damages to [plaintiff] included 'the value of the house.' * * * Afterwards, [plaintiff] asked the Court to include in the judgment a return for the $110,000 that he had deposited with [defendant]. [Defendant] objected. That $110,000 was the only 'value of the house' that [plaintiff] possessed, according to the verdict, and that same verdict included the 'value of the house' in their $1.36 million award of damages in his favor. The trial court in effect overturned the jury verdict, and that was beyond its power."

In response, plaintiff asserts that the second question on the verdict form should be understood as referring to defendant's theory presented to the jury that plaintiff agreed to take fee title to the Muhs quarry house, and $200,000 in cash, in lieu of the 20 percent of the value of defendant. According to plaintiff, the phrase "value of the house" in the verdict form refers to the value of the Muhs quarry house contemplated by the settlement offer, not to plaintiff's deposit of $110,000 from the proceeds of the 28th Street house in McMinnville. By answering that the $1.36 million included the "value of the house," plaintiff contends that the jury's verdict as a whole should be understood as a finding that no agreement had been reached as to Town's $900,000 settlement offer and that plaintiff was therefore entitled to his percentage of the added value to defendant, but not to the Muhs quarry house or its value, and that he was also entitled to recoup his deposit of $110,000 from defendant for having been required to vacate the Muhs quarry house by the jury's rejection of his claim of a life estate.

The question on appeal is whether the trial court's interpretation of the record and the verdict form is correct. Plaintiff's contract claim, as pleaded, does not include a request for the return of $110,000 deposited with defendant. That claim arises in the context f his second claim for declaratory relief. In paragraph 20 of he claim, he alleged,

"In reliance on the agree: .t, plaintiff and his wife sold their [28th Street in McMin. .e] home and moved into the [Muhs quarry] residence wl they continue to reside. On June 13, 1995, plaintiff pa to [defendant] the sum of

$110,000 representing the net proceeds of the sale of the Miller's previous [28th Street] home. Since that date, [defendant] has had and continues to have the use of that money interest free."

As relief, plaintiff sought a declaration of his rights "pursuant to the agreement stated in the Second Claim for Relief." In its answer, defendant admitted that plaintiff paid to it "the sum of $110,000 representing some portion of the sale proceeds of the Miller's prior residence, and otherwise denies the remainder of paragraph 20." At trial, defendant, in response to plaintiff's claim on his contract theory, contended first that the contract was too indefinite to be enforced and, second, that the parties had modified the compensation agreement for added value when plaintiff agreed to $900,000 ($700,000 of value attributed to the Muhs quarry house, and $200,000 in cash). Accordingly, the court instructed the jury:

"[d]efendant contends that the only agreement the parties made about retirement benefits was an agreement on a $900,000 retirement package in August 1997 and that the agreement included transfer of the title to the house— that's the Muhs quarry house—as part of the $900,000 value.

"* * * * *

"If you find that an agreement existed between the parties prior to August 1997, then you must consider [defendant's] affirmative defense that the parties modified their contract by reaching a new agreement in 1997 for a $900,000 retirement benefit."

Regarding the verdict form, the court instructed:

"The first question you will be asked is about the breach of contract claim and you can make your findings, either blank A for [plaintiff] or second blank for [defendant.] If you find for [plaintiff], you determine the amount of damages. If you answer that question in favor of [plaintiff], you go on and answer the question, if you find for [plaintiff], does the jury award—the amount of damages—include the value of the house, and you answer that either yes or no.

"* * * * *

"[I]f * * * you award damages to [plaintiff] and on the sub-question you * * * *advise me that you included the value*

*of the house in the money damages award to [plaintiff], then
you would not consider the life estate claim in the house.* But
if you did not include the value of the house in the money
judgment award, then you would consider the life estate
claim, and that's in question three." (Emphasis added.)

It is clear from those instructions that the question
on the verdict form about "the value of the house" referred to
the fair market value of the Muhs quarry house, which was
the subject of defendant's claim that the parties had mutu-
ally modified their compensation agreement. By its instruc-
tion, the court told the jury that, if it awarded plaintiff the
Muhs quarry house or its equivalent in cash in their answer
to the first question under the alleged modification agree-
ment, then it was precluded from considering plaintiff's claim
for a life estate in that house. When the jury awarded $1.36
million as the compensation owed under the contract, and
also found that plaintiff was not entitled to any further occu-
pancy of the Muhs quarry house, it found implicitly that the
parties had not agreed to a modification of the contract. Thus,
its verdict on that claim under the court's instructions did not
include, nor was it ever intended to include, the $110,000, a
figure that does not appear on the verdict form. The question
about "the value of the house" referred only to the Muhs
quarry house itself, not the $110,000 in cash.

Moreover, the amounts in the verdict itself support
the trial court's interpretation of the record. There is evi-
dence in the record that the company's fair market value,
established by a willing purchaser's bid, was $8 million.
There is also evidence that the parties agreed to subtract $1.2
million from that amount. The award of $1.36 million is 20
percent of that amount. If the jury had intended to give plain-
tiff $110,000 as part of its award, the award would have been
for more than $1.36 million. In sum, all of those circum-
stances show that the trial court did not err in its interpre-
tation of the jury's verdict.[18]

Finally, in defendant's tenth assignment of error, it
contends that "the trial court erred in awarding prejudgment

---

[18] No evidence was presented to contradict plaintiff's assertion that he was
entitled to receive the $110,000 back if he ever had to vacate the house.

interest to Miller." In the first subassignment, defendant contends that, "once a verdict has been returned by the jury that expresses its intention and the jury has been discharged, it is well settled that 'the court is powerless to amend it, however erroneous it may be.'" In a second subassignment, it asserts that plaintiff's pleadings are deficient, in that they "failed to plead a sufficient claim for prejudgment interest." In a third subassignment, it argues that "in any event, [plaintiff]'s claim does not satisfy the requirements for an award of prejudgment interest," because the amount of damages was not ascertainable and the specific date from which interest should run was not clear.

Plaintiff first responds that the issues raised on appeal were not preserved below. At trial, defendant told the trial court,

> "[T]he jury has been dismissed, Your Honor, so it's too late to amend. The questions that should have been posed to the finder of fact is—actually a couple—was it liquidated or not, *i.e.*, could someone have determined what it was that was owed, and when it was owed."

The court asked in response, "Is that a jury question?," and defendant argued that it was because the date was unclear (it could have been either when plaintiff quit or when the negotiations for a settlement failed) and because the amount due was unascertainable. The court then said that, once the jury found a contract to exist, it would have ruled as a matter of law that the amount was due and payable upon plaintiff's retirement or the sale of the business. The court ultimately said:

> "I'll allow that amendment. Doesn't change anything. There is no fact question as far as the termination for the entitlement of the payment. That was admitted as a matter of law by Mr. Town, ultimately. Then, the question is, is [the amount] ascertainable under Oregon legal standards, so is it recoverable. What further do you want to say on that?"

After the parties said that they had nothing further to add to the discussion, the court ruled that the 20 percent added value to defendant was ascertainable to a sufficient degree of certainty to award prejudgment interest.

None of defendant's arguments below raised the legal issue of the sufficiency of plaintiff's pleading in his third or fourth amended complaint. However, by arguing to the trial court that it could not grant an amendment to the pleadings after the jury had been discharged and that plaintiff was not entitled to prejudgment interest because the amount owed was not ascertainable, defendant asserted the same issues to the trial court that it now raises in its tenth assignment of error. We turn to defendant's arguments on those issues.

■ Defendant contends that the rule of *Printing Industry v. Banks*, 150 Or 554, 559, 46 P2d 596 (1935), precluded the court from awarding prejudgment interest because the judgment entered does not comport with the verdict returned by the jury. The flaw in defendant's argument is that the ruling in *Printing Industry* is based wholly on two former statutes, section 2-405 and section 2-1506 of the Oregon Code of 1930. Those statutes provided that, "[w]hen a verdict is found for the plaintiff in an action for recovery of money, the jury shall also assess the amount of recovery," and that "if the trial be by jury, judgment shall be given by the court in conformity with the verdict and so entered by the clerk." The *Printing Industry* court interpreted those statutes as prohibiting any changes from the jury's verdict on the amount of damages, even if the law clearly allowed additional damages. The court said, "[t]his question we think is controlled wholly by statute." *Printing Industry*, 150 Or at 560.[19]

The statutes involved in *Printing Industry*, were repealed in 1979 and replaced by provisions of the Oregon Rules of Civil Procedure. Or Laws 1979, ch 284, § 199. ORCP 61 A(2) provides, "When a *general* verdict is found in favor of a party asserting a claim for the recovery of money, the jury shall also assess the amount of recovery." (Emphasis added.) However, in the case of a *special* verdict, ORCP 61 B provides that "[t]he court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." Moreover, no statute presently requires a trial

---

[19] The above-mentioned statutes were later renumbered as *former* ORS 16.210, *repealed by* Or Laws 1979, ch 284, § 199.

court to submit to the jury a question about damages where there are no issues of fact involved. *See Hoekstre v. Golden B. Products*, 77 Or App 104, 712 P2d 149 (1985), *rev den* 300 Or 563 (1986) (in a case involving a special verdict, where the plaintiff's right to recover interest did not rest on a factual issue, the court properly removed that element of damages from the jury's consideration and awarded interest as a matter of law).

In *Krieg v. Union Pac. Land Res. Corp.*, 269 Or 221, 234, 525 P2d 48 (1974), the court held that "interest on unliquidated damages for breach of contract is proper, where (1) the exact amount of damages is either ascertained or readily ascertainable; and (2) the time from which the interest runs is easily ascertained." Thus, defendant's arguments turn on whether the date of accrual of interest and the amount due were easily ascertainable after the jury had determined that the parties entered an agreement for 20 percent of the added value, payable when plaintiff retired or defendant was sold.

As to the date on which interest would begin to accrue, the record contains only one possible date, based on the terms of the agreement stating that "whatever [plaintiff] could make the company worth, less the $1.2 million times 20 percent, would be what [plaintiff] would get when [he] either retired or the company were sold." The record showed that plaintiff retired on February 28, 1997. No evidence was presented that would support any date for the commencement of interest other than the date of retirement.[20] The trial court did not err in ruling that the date was ascertainable as a matter of law.

As to the amount of damages on which interest would accrue, the trial court was also correct that it could be calculated with certainty as soon as the jury determined the existence of the 20 percent agreement. In *Strader v. Grange Mut. Ins. Co.*, 179 Or App 329, 339, 39 P3d 903, *rev den* 334 Or 190

---

[20] Town testified that "I told Jack Wessel that I was going to go down and give [plaintiff] 20% of the value of [defendant] at the time he left the company." He also testified that, "I went to McMinnville and told [plaintiff] that I was going to give him 20% of the value of [defendant] at the time he left," and that "I told [plaintiff] that I would gift to him 20% of the value of the company at the time he left."

(2002), when confronted with a case where the jury heard conflicting evidence about the amount of damages based on evidence of actual expenses and prevailing market notes, we stated:

> "By now, it is well settled that, 'even though damages are not ascertainable until issues of fact have been decided [by the jury], prejudgment interest is proper.' *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto,* 129 Or App 206, 218, 879 P2d 193 (1994), *aff'd in part, rev'd in part* 325 Or 46, 932 P2d 1141 (1997). Put another way, '[a]lthough there are questions of fact about the amounts owed, that does not mean that defendant did not owe sums certain at dates certain.' *Hazelwood Water Dist. v. First Union Management,* 78 Or App 226, 231, 715 P2d 498 (1986)."

In *Strader,* the defendant raised almost identical arguments as are raised here. It argued that the amount of damages was not ascertainable because the plaintiffs had submitted varying claims at different times before and during trial, because the amount plaintiff ultimately pleaded differed from their pretrial claims, and because both of those amounts differed from the amount awarded by the jury's. We rejected the arguments in *Strader* for the same reasons that we reject defendant's arguments here. Under the terms of the parties' agreement, the amount of damages was 20 percent of the fair market value of defendant. The uncertainty of the value of defendant does not detract from the amount of damages because the latter is calculable once fair market value of defendant is determined. In other words, it was always within the ability of the parties to ascertain the amount of compensation owed under the agreement. We conclude that, after the factual issues were determined by a jury, the trial court properly amended prejudgment interest.

Affirmed.